## MILLER, AS ALIEN PROPERTY CUSTODIAN, ET AL. *v.* ROBERTSON.

## ROBERTSON *v.* MILLER, AS ALIEN PROPERTY CUSTODIAN, ET AL.

### APPEALS FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT

Nos. 35 and 145. Argued May 1, 2, 1924.—Decided November 17, 1924.

1. Section 9 of the Trading with the Enemy Act, which gives to "any person, not an enemy, or ally of enemy . . . to whom any debt may be owing from an enemy, or ally of enemy," the right to "institute a suit in equity in the district court . . . to establish the . . . debt so claimed," should be construed liberally to effect its purpose of preventing or lessening loss or inconvenience likely to result to non-enemy persons from seizures of enemy property under the act. P. 247.

2. The term "debt" in this section is not confined to causes for which the common law action of debt might be maintained. P. 248.

3. An instrument executed by the owner of an operating mine and an ore-buyer, for the sale of ore which both parties knew to exist in the mine in substantial quantity, described the product covered by it as the total production of ore "shipped by the seller" from the mine, but manifested its intention as binding the seller, during a specified period, to mine ore, select it for shipment with the aid of an increase of plant, and ship all of a specified grade to the buyer, and as binding the buyer to take such higher grade ore at the prices designated, and as giving the buyer an option on the lower grades. *Held*, a mutual and valid contract. P. 250.

4. In determining the validity of such contract, an opinion as to the seller's legal obligations under it, expressed by the seller's manager to the buyer's agent after the contract was made, is of no weight. P. 252.

5. The evidence does not sustain a contention that the plaintiff's assignor failed to ship ore "in as nearly as possible equal weekly quantities," as required by the contract in controversy. *Id.*

6. Where a mining company and a smelting company were both subsidiaries of a parent corporation, with common executive officers and boards of directors, but were, nevertheless, independent entities, with different general managers and operating staffs, a contract by the smelting company for the sale of its ore does not include ore of the mining company which might be similarly described, and which, if the contracting company had control over the other, might be deemed to be included. P. 254.

7. Facts found on undisputed evidence by a master, whose report was confirmed by the District Court and its ruling sustained by the Circuit Court of Appeals, will be accepted here. P. 256.

8. The plaintiff's assignor, a mining corporation, upon a buyer's refusal to accept ore under a contract of sale, resold it, for the best price obtainable after diligent, *bona fide* effort, to a smelting corporation, which could have gotten like ore in the market on as favorable terms. The two corporations were separate entities but both subsidiaries of a third. *Held*, that their intercorporate relations afforded no ground for setting off profits made by the smelting company after smelting the ore against the damages resulting to the mining company from the original buyer's breach of contract. P. 256.

9. Service of summons and complaint upon representatives of a German firm in this country in an attempt to commence an action for breach of contract, *held* a demand from which interest might be allowed. P. 257.

10. The rule of sovereign immunity from liability for interest is inapplicable to a suit under the Trading with the Enemy Act, in which no debt is alleged as owing from the United States to the plaintiff. P. 257.

11. Though generally not allowable upon unliquidated damages, interest or its equivalent may be included, in the exercise of a sound discretion, when necessary in fixing fair compensation. P. 258.

12. Where a German firm broke its contract to buy ore and damages were demanded before this country entered the late war, and for a long time after that event it continued to have general representatives here and property sufficient to pay the damages, which was taken over by the Alien Property Custodian, interest was properly allowed, in a suit against it under the Trading with the Enemy Act, from the time of the demand, including the period of this country's participation in the war. P. 258.

13. Upon breach of a contract of sale, if the seller in reselling pays less freight on the goods than he must have paid had he shipped them under the contract, the difference should be credited to the buyer in estimating the damages for the breach.  P. 259.

286 Fed. 503, affirmed.

CROSS appeals from a decree of the Circuit Court of Appeals which affirmed, with a modification, a decree for the plaintiff, Robertson, in a suit for damages for breach of contract, brought under the Trading with the Enemy Act.

*Mr. Lindley M. Garrison,* Special Assistant to the Attorney General, with whom *Mr. Solicitor General Beck, Mr. Adna R. Johnson, Jr.,* and *Mr. Dean Hill Stanley,* Special Assistants to the Attorney General, were on the briefs, for Miller, Alien Property Custodian, et al.

*Mr. Alfred Sutro* and *Mr. C. W. Stockton,* with whom *Mr. Kenneth E. Stockton, Mr. E. S. Pillsbury, Mr. Frank D. Madison, Mr. H. D. Pillsbury* and *Mr. Oscar Sutro* were on the briefs, for Robertson.

MR. JUSTICE BUTLER delivered the opinion of the Court.

This is a suit brought under § 9 of the Act of Congress, approved October 6, 1917, known as the "Trading with the Enemy Act," c. 106, 40 Stat. 411, 419. The plaintiff below, Frederick Y. Robertson, is a citizen of the United States, and sued as assignee of the Mammoth Copper Mining Company, a Maine corporation, hereinafter called the "seller." The defendants are the Alien Property Custodian, the Treasurer of the United States and five citizens of Germany, enemies of the United States, as defined by the act, copartners doing business under the name of Beer, Sondheimer & Company, and hereinafter called the "buyers." The purpose of the suit is to establish a "debt" plaintiff claims to be owing from the enemy defendants on account of damages alleged to have resulted

to the seller from the buyers' breach of a contract for the purchase of zinc ore.

The contract provided: "The product covered by this contract is the total production of zinc crude ore shipped by the seller from its properties in Shasta County, California. The buyer is not obligated to accept any of the product running less than thirty-three (33%) per cent. metallic zinc. Should the seller produce a zinc product running less than thirty-three (33%) per cent. metallic zinc, the buyer reserves the option to purchase same under the terms of this contract. If the buyer should not elect to accept such product, the seller has the privilege of disposing of it elsewhere. This contract shall run for a period of one year from the date of first shipment made after the completion of the picking plant which the seller contemplates building, but in no event shall the life of the contract exceed eighteen (18) months from the date of its execution." Places of delivery were provided for, and the seller agreed to bear freight charges to Bartlesville, Oklahoma, or their equivalent. Shipments were to be made in as nearly as possible equal weekly quantities. The prices were $19 per ton for ore containing 40 per cent. metallic zinc, based on a spelter price of $5 per cwt. at St. Louis, to be increased $1 per ton for each unit of one per per cent. over, and to be decreased correspondingly for each unit below, 40 per cent.; and also to be increased or decreased five cents per ton for each cent the market price of spelter at St. Louis rose above or fell below $5 per cwt. And it was provided that, "Whenever the production or shipment of ore by the seller or the receipt or treatment of the ore by the buyer is prevented or delayed . . . by . . . any cause . . . which may be properly termed 'Vis Major' . . . this agreement shall be suspended during such delay or prevention; the seller, if so prevented or delayed in producing or

shipping the ore hereby contracted for, shall not be under any duty or obligation to furnish ore to the buyer . . . while . . . so prevented or delayed, and the buyer if so prevented or delayed in receiving or treating the ore hereby contracted for, shall not be under any duty or obligation to receive any of the ore hereby contracted for, while so prevented or delayed. Upon the termination of the delay or interruption herein set forth, the obligation of the contracting parties shall be resumed."

The District Court gave judgment in favor of the seller for $259,597.21 with costs. On appeal by the Custodian and Treasurer, and a cross appeal by the plaintiff (Judicial Code, § 128), the Circuit Court of Appeals affirmed the decree, except that the amount of interest allowed by the trial court was increased. 286 Fed. 503. The Custodian and Treasurer have appealed to this court. Judicial Code, § 241. They contend that plaintiff's claim was not a "debt" within the meaning of § 9 of the act; that the alleged contract was lacking in mutuality and void for want of consideration; that the seller broke the contract by refusing to make shipments "in as near as possible equal weekly quantities"; that the contract was not enforceable because made in violation of an earlier contract for the sale of the same ore; that no more than nominal damages should have been awarded; and that the lower court erred in allowing interest. The plaintiff has appealed and contends that the lower courts erred in giving the buyers credit for the amount by which the freight charges on the ore resold were less than they would have been if the ore had been shipped under the contract. The enemy defendants did not appear in the case; and it has been stipulated that the decree will not be enforced against them personally.

1. Is plaintiff's claim a " debt " within the meaning of § 9 of the act?

This section gives to " any person, not an enemy, or ally of enemy . . . to whom any debt may be owing from an enemy, or ally of enemy," the right to " institute a suit in equity in the district court . . . (to which suit the alien property custodian or the Treasurer of the United States, as the case may be, shall be made a party defendant), to establish the . . . debt so claimed. . . ."

At the time of the passage of the act, a large amount of property was owned and much business was carried on by alien enemies and their allies in this country. Congress determined that their property should be taken over and that trade with them should cease. The purpose was to weaken enemy countries by depriving their supporters of power to give aid. But the seizure of the money and property of enemies and their allies would tend to hinder and might embarrass or ruin those having business transactions with them. By the taking, the property seized would be put out of reach of persons claiming it and beyond the power of creditors to attach it for debt. The purpose of § 9 was to prevent or lessen losses and inconvenience liable to result to non-enemy persons. This provision is highly remedial and should be liberally construed to effect the purposes of Congress and to give remedy in all cases intended to be covered. *United States* v. *Anderson,* 9 Wall. 56, 65, 66; *United States* v. *Padelford,* 9 Wall. 531, 538. The just purpose of the section is not to be defeated by a narrow interpretation or by unnecessarily restricting the meaning of the word within technical limitations. *United States* v. *Freeman,* 3 How. 556, 565; *Danciger* v. *Cooley,* 248 U. S. 319, 326; *French* v. *Weeks,* 259 U. S. 326, 328.

Appellants contend that " debt ", as used in § 9, is limited to its common law meaning. Undoubtedly, Congress intended to include causes of action which at common law were enforceable in an action of debt, such as those arising

on bonds, notes, and other express promises to pay, (*Raborg* v. *Peyton,* 2 Wheat. 385; *United States* v. *Colt,* 25 Fed. Cas. No. 14,839, p. 581) quantum meruit and quantum valebat. *Smith* v. *First Congregational Meetinghouse,* 8 Pick. 178, 181;*Norris* v. *School District,* 12 Me. 293, 297; *Jenkins* v. *Richardson,* 6 J. J. Marshall (Ky.) 441;·*Mahaffey* v. *Petty,* 1 Ga. 261, 264.

The meaning of the word "debt" as used in many statutes is not restricted to demands enforceable in actions of debt. Lord Coke, referring to the Statute of Merton (A. D. 1235) said (II Institutes, 89): "Debitum signifieth not only debt, for which an action of debt doth lie, but here in this ancient act of parliament, it signifieth generally any duty to be yielded or paid . . ." Chief Justice Shaw, referring to a statute making members of a corporation liable for its "debts", said (*Mill Dam Foundery* v. *Hovey,* 21 Pick. 417, 455): "For, though a question was made, whether such a claim for unliquidated damages is a debt, within the meaning of the statute, we do not think it admits of a reasonable doubt, that all such claims for damages were intended to be included in the term 'debt.'" A cause of action for damages for breach of contract is a debt within the meaning of the Bankruptcy Act, and of laws relating to attachments, to receiverships, to stockholders' liability for corporate debts, to probate, to set-offs, to fraudulent conveyances, and to limitation of actions.[1]

---

[1] Bankruptcy Act: *Central Trust Co.* v. *Chicago Auditorium Assn.,* 240 U. S. 581, 592. Compare Rev. Stats., §§ 1237, 1610, 2296, 4537. Attachment laws: *Fisher* v. *Consequa,* 9 Fed. Cas. No. 4816, p. 120; *New Haven Saw-Mill Co.* v. *Fowler,* 28 Conn. 103, 108; *Showen* v. *J. L. Owens Co.,* 158 Mich. 321, 334; *Hyman* v. *Newell,* 7 Colo. App. 78, 80; *Hunt* v. *Norris,* 4 Mart. (La.) 517, 532; *Wilson* v. *Wilson,* 8 Gill. (Md.) 192, 194; *Baumgardner* v. *Dowagiac Mfg. Co.,* 50 Minn. 381; *Cheney* v. *Straube,* 35 Nebr. 521; *Barber* v. *Robeson,* 15 N. J. L. 17, 19; *Lenox* v. *Howland,* 3 Caines (N. Y.)

There is nothing in the language of the act or the reasons for its enactment to indicate a purpose to restrict the right to institute suits in equity as authorized in § 9 to causes of action cognizable in debt under technical procedural rules.  The words of a statute are to be read in their natural and ordinary sense, giving them a meaning to their full extent and capacity, unless some strong reason to the contrary appears. *Birks, App., Allison, Resp.,* 13 C. B. (N. S.) 12, 23; *Minor* v. *Mechanics' Bank,* 1 Pet. 46, 64; *DeGanay* v. *Lederer,* 250 U. S. 376, 381.

We think it immaterial whether plaintiff's cause of action is one for which an action of debt might be maintained.  It would be unreasonable and contrary to the intention of Congress to exclude claims like that here in question, and we hold them to be included.

2. Was there a lack of mutuality and want of consideration?

Appellants contend that the parties failed to make a contract, and assert the seller promised only such ore as

323; *Ward* v. *Howard,* 12 Oh. St. 158, 163; *Peter* v. *Butler,* 1 Leigh (Va.) 285; *State* v. *Superior Court,* 93 Wash. 98, 101.  Receivership laws: *Kalkhoff* v. *Nelson,* 60 Minn. 284, 290; *Rosenbaum* v. *Credit System Co.,* 61 N. J. L., 543, 548; *Steel & Iron Co.* v. *Detroit R. R. Co.,* 154 Mich. 182, 185.  Stockholders' liability laws: *Mill Dam Foundery* v. *Hovey,* 21 Pick. 417, 455; *American Ice Cream Co.* v. *Economy Laundry Co.,* 148 Ga. 624; *Dryden* v. *Kellogg,* 2 Mo. App. 87, 93; *Green* v. *Easton,* 74 Hun (N. Y.) 329, 330.  Probate laws: *Frazer* v. *Tunis,* 1 Binney (Pa.) 254, 263; *Insurance Co.* v. *Meeker,* 37 N. J. L. 282, 300, *et seq.; Hebert* v. *Handy,* 29 R. I. 543.  Set-off: *Moore* v. *Weir,* 3 Sneed (Tenn.) 46, 50; *Russell* v. *Miller,* 54 Pa. St. 154, 164.  Fraudulent conveyances: *Woodbury* v. *Sparrell Print,* 187 Mass. 426, 428; *Anderson* v. *Anderson,* 64 Ala. 403, 405.  Statutes of limitation: *Davies* v. *Texas Central R. R. Co.,* 62 Tex. Civ. App. 599, 605.  See also *Irving Bank-Columbia Trust Co.* v. *New York Rys. Co.,* 292 Fed. 429, 433; *Lothrop* v. *Reed,* 13 Allen (Mass.) 294; *State* v. *Sayre,* 91 Oh. St. 85, 94; *Little* v. *Dyer,* 138 Ill. 272, 277; *Allen* v. *Distilling Co. of America,* 87 N. J. Eq. 531, 539; *Melvin* v. *State,* 121 Cal. 16, 24.

it might ship from the mine and was not bound to ship all the ore produced or to mine or ship any ore. They also argue that certain statements made by the seller's manager, in correspondence between him and the agent of the buyers, after the instrument was signed, show that the seller itself so interpreted the writing. The provision to which they refer is this: "The product covered by this contract is the total production of zinc crude ore shipped by the seller from its properties in Shasta County, California." The statements of the manager were made in October and November, 1914, in answer to inquiries of the buyers' agent, and were to the effect that the tonnage of ore to be shipped depended altogether on the market price of spelter, and that with spelter quotations below $5 per cwt. shipments would be very light, and that if prices rose above that figure, the seller would probably ship about 200 tons per month.

The intention of the parties is to be gathered, not from the single sentence above quoted, but from the whole instrument read in the light of the circumstances existing at the time of negotiations leading up to its execution. The buyers had a large business in the smelting of zinc ore in the United States. The seller had been engaged for a long time in the mining of copper ore from the Mammoth Mine. Early in 1914, there was discovered in that mine a large body of zinc ore, containing about 40,000 tons. The sellers desired to dispose of, and the buyers wanted, zinc ore. While there had been no regular weekly or monthly production or shipments prior to the signing of the writing, the seller had made a number of shipments to the buyers. The work of developing the ore body in preparation for production was in progress. The mine was already equipped and capable of producing ore. The writing shows that the completion of a picking plant was contemplated. The year covered was to commence on the date of the first shipment after its completion. When

the instrument was executed, September 29, 1914, both parties knew the quality of the ore and that the quantity was substantial.

The parties intended to make a contract,—one to sell, and the other to buy, zinc ore. By plain statements and manifest implications, the seller was bound for a definite time not otherwise to dispose of its ore; the buyers were given an option on the lower grade ore; the seller was bound at all times, when not prevented or delayed by some cause beyond its control, to mine and to ship to the buyers the total production of zinc ore of the specified grade; and the buyers were bound to take and pay for all such ore when not prevented or delayed by causes beyond their control as specified in the contract. The quantities of ore to be mined and shipped were not limited to those to be produced by the equipment and methods employed at the time of the execution of the contract. The proposed picking plant was to be added, and increased output was expected and bargained for.

The opinion of the manager of the seller as to its legal obligations under the contract, as reflected by his statements in correspondence after the execution of the instrument, is not entitled to any weight in determining whether a valid contract was made. The writing did not give the seller the option to ship or to refrain from shipping as it saw fit, or leave the quantity to be delivered to its choice. There was no want of consideration or lack of mutuality.

3. Appellants contend that the seller failed to make shipments in as nearly as possible equal weekly quantities, as provided in the contract, and that the buyers thereby were released from performance.

The contract was signed September 29, 1914, but the first shipment was not until November 28. Between the last mentioned date and March 11, the seller made 28 shipments, which were accepted and paid for. There was

considerable inequality in the weekly shipments. It is apparent from the language of the contract that variations were expected. It was contemplated that production would be increased substantially by the use of the picking plant. From the time of the execution of the contract to about the time of the first shipment, the market price of spelter did not exceed $5 per cwt. and consequently the contract price of ore was not more than $19 per ton. When the first shipments were made, spelter prices were $5.10 per cwt. By March 1, they advanced to $9.40, making the contract price of ore $41 per ton. By March 17, they receded to $7.80, making the contract price of ore $33 per ton. January 20, when spelter was at $6 per cwt. and the contract price of ore was $24 a ton, the agent of the buyers wrote a letter to the manager of the seller in which he called attention to the high price and, in effect, suggested that the seller ship as much as possible.

Later, the prices of spelter rose enormously, but the market prices of ore declined until buyers could obtain it on their own terms. The war had created a great demand for zinc. The ores produced in Japan, Spain, Mexico, and Australia were cut off from their former markets in Germany and were shipped into this country in quantities far in excess of the capacity of the smelters. February 23, when the spelter prices were over $8.00 per cwt., making the price of ore more than $34 per ton, the buyers tried to get the seller to consent to reduction of the contract prices. But no change was made. Increased tonnages were shipped after completion of the picking plant, March 5. March 17, the buyers sent a telegram to the seller, calling attention to the shipment of 50 tons daily from March 6 to March 9, and stating that the monthly average from the beginning had been about 200 tons, and added, " In view of abnormal conditions we will only accept tonnages reasonably equal to the average monthly amount

shipped heretofore. We are unable to receive and smelt any further tonnage in accordance with page five [meaning the vis major clause] of our contract with you. We have advised all other shippers accordingly." They did not object to inequality of weekly shipments, but attempted to invoke the vis major clause to justify or excuse their refusal to take and pay for the ore at the contract price applicable at that time.

The District Court found that the seller attempted in good faith to carry out its part of the contract until it was stopped; that the claim that the seller broke the contract was without merit; that no objection to the deliveries was made on the ground of inequality, and that the breach was waived as to all ore accepted; that the buyers' refusal to accept the ore tendered in March was based solely on the vis major clause; and that there was no evidence that the seller did not ship in as nearly equal weekly quantities as possible. And the Circuit Court of Appeals found that the Mammoth Company carried out its promises under the terms of the contract. No reason has been shown why the findings of the lower courts should be disturbed. *Washington Securities Co.* v. *United States*, 234 U. S. 76, 78. Our own examination of the evidence satisfies us that there is no merit in appellants' contention that there was a breach of the contract by the seller.

4. Appellants contend that the contract sued on was not enforceable because made in violation of an earlier agreement, dated June 10, 1914, selling the same ore.

The Mammoth Mining Company, operating in Kennett, California, and the United States Smelting Company, operating in Salt Lake City, Utah, were subsidiaries of the United States Smelting, Refining & Mining Company. The executive officers and boards of directors of the subsidiary companies and of the parent company were substantially identical, but each subsidiary had a

separate general manager and operating staff. On June 10, 1914, the Smelting Company made a contract covering the sale of certain ores to the American Metal Company, and appellants assert that it covered the same ore which was subsequently sold by the contract in suit. The product described in the earlier contract is " all the zinc sulphide crude ore, zinc sulphide concentrates and zinc sulphide middlings, shipped from Midvale, Utah, Kennett, California, or any other point by or under the control of the seller during the period of this agreement." Through some misapprehension, the lower courts considered the case as if the Mammoth Company were a subsidiary of the Smelting Company. This was more favorable to appellants than was warranted by the facts. Nevertheless, they declined to sustain appellants' contention. Both held that the Mammoth Company and the Smelting Company were separate and independent corporations, and the Circuit Court of Appeals held that the Smelting Company did not make the contract for the Mammoth Company. 286 Fed. 503, 509. The zinc product of the Mammoth Mine is not specifically mentioned. The language is not definite, and, as that mine is at Kennett, one of the shipping points mentioned, the product might be deemed to be included, if under the control of the Smelting Company. Neither of the parties to this suit was a party to that contract, and parol evidence was given to show what ore was covered. *Barreda* v. *Silsbee,* 21 How. 146, 169; *Central Coal & Coke Co.* v. *Good & Co.,* 120 Fed. 793, 798. It was shown that the Mammoth Company and the Smelting Company, while both subsidiary to the Mining Company, were wholly independent; that neither had control over the other and that the Smelting Company did not control and had no authority to sell the product of the Mammoth Mine. Appellants' contention is not supported by the facts.

5. Appellants insist that no more than nominal damages should have been awarded because, as they say, the evidence showed no actual loss on resale. After Beer, Sondheimer & Company rejected the ore, the Mammoth Company resold it to the United States Smelting Company. The amount of the judgment is based on the difference between resale prices and those fixed by the contract in suit. The purchaser smelted the ore and made a profit. The master found that the price obtained on resale represented the best price that the Mammoth Company could obtain after energetic efforts in good faith to sell the ore on more favorable terms. Appellants make no claim of bad faith. There was no dispute as to the evidentiary facts. The report of the master was confirmed by the trial court, and its ruling was sustained on appeal. It must be taken as established that the resale was made in good faith for the best obtainable price. *Crawford* v. *Neal,* 144 U. S. 585, 596. The Mammoth Company and the Smelting Company were separate entities. The intercorporate relations above referred to furnish no ground for charging against the Mammoth Company the profits made by the Smelting Company. It is obvious from the facts found that the latter could have obtained zinc ore in the market on as favorable terms. The Mammoth Company did not operate a smelter or use the ore in its own business. The smelting of the ore was separate and apart from the contract in suit, and the seller was not bound to smelt the ore or have it smelted and account for the profits, if any, to the buyers. The amount of profits realized by the Smelting Company was immaterial, and the buyers had no right to have it set off against the damages resulting from their breach of the contract.

6. The District Court allowed interest from July 3, 1919; the Circuit Court of Appeals from June 29, 1916. Appellants object on the ground that this is a suit against the United States, and interest is not allowable against it;

that at common law interest was not recoverable, and the case was not a proper one for the exercise of chancery discretion; and that, if it was not an abuse of discretion to allow interest from the date when the war was practically ended, its allowance from June 29, 1916, was erroneous. In an attempt to commence an action in Utah against the buyers to recover damages resulting from their breach, the seller, on June 29, 1916, served a summons and complaint on the representatives of the buyers. On the facts found, which need not be repeated here, the Circuit Court of Appeals (286 Fed. 511) rightly held the attempted service to amount to a demand, and that interest might be allowed from that date. See *Goddard* v. *Foster,* 17 Wall. 123, 143; *Kaufman* v. *Tredway,* 195 U. S. 271, 273; *United States* v. *Poulson,* 30 Fed. 231; *Dwyer* v. *United States,* 93 Fed. 616; *Mather* v. *Stokely,* 218 Fed. 764, 767.

While the suit, as held in *Banco Mexicano* v. *Deutsche Bank,* 263 U. S. 591, 603 (affirming 289 Fed. 924), is one against the United States, the claim was not against it. No debt was alleged to be owing from it to the plaintiff. The rule of sovereign immunity from liability for interest (Judicial Code, § 177; *National Volunteer Home* v. *Parrish,* 229 U. S. 494; *United States* v. *North American Co.,* 253 U. S. 330, 336; *Seaboard Air Line Ry. Co.* v. *United States,* 261 U. S. 299, 304) does not apply.

Compensation is a fundamental principle of damages, whether the action is in contract or in tort. *Wicker* v. *Hoppock,* 6 Wall 94, 99. One who fails to perform his contract is justly bound to make good all damages that accrue naturally from the breach; and the other party is entitled to be put in as good a position pecuniarily as he would have been by performance of the contract. *Curtis* v. *Innerarity,* 6 How. 146, 154. One who has had the use of money owing to another justly may be required to pay interest from the time the payment should have been

made. Both in law and in equity, interest is allowed on money due. *Spalding* v. *Mason,* 161 U. S. 375, 396. Generally, interest is not allowed upon unliquidated damages. *Mowry* v. *Whitney,* 14 Wall. 620, 653. But when necessary in order to arrive at fair compensation, the court in the exercise of a sound discretion may include interest or its equivalent as an element of damages. See *Bernhard* v. *Rochester German Insurance Co.,* 79 Conn. 388, 397; *Frazer* v. *Bigelow Carpet Co.,* 141 Mass. 126; *Faber* v. *City of New York,* 222 N. Y. 255, 262; *De La Rama* v. *De La Rama,* 241 U. S. 154, 159, 160; *The Paquete Habana,* 189 U. S. 453, 467; *Eddy* v. *Lafayette,* 163 U. S. 456, 467; *Demotte* v. *Whybrow,* 263 Fed. 366, 368.

In this case, at least as early as June 29, 1916, the date of demand, the seller was entitled to have from the buyers the difference between the sum which it would have received prior to that date, if the buyers had kept their contract, and the amount it received on resale. Payment in 1924 or later of that sum is not full compensation. Cf. *Seaboard Air Line Ry. Co.* v. *United States, supra,* 306. All damages had accrued prior to the demand. There was nothing dependent on any future event. The elements necessary to a calculation of the amount the seller was then entitled to have to make it whole,—namely, the quantities of ore produced, its metallic content, the prices to be paid by the buyers under the contract, and the amount realized on resale,—were known or ascertainable. Our entrance into the war was long subsequent to June 29, 1916, the date of the demand. General representatives, who had long been in charge of the business in this country of Beer, Sondheimer & Company, remained here until after that event. At all times until it was taken over under the act, they had money and property of that firm more than sufficient to make good the seller's damages. It would be unjust and inconsistent with the remedial purposes of § 9 to hold that the seized enemy property cannot

be held for the full amount of the seller's loss, and that, to the extent of interest during the period of the war,[2] compensation must be denied. The proposition that the enemy defendants, as a matter of law, are entitled to be relieved from interest during the war cannot be sustained. Cf. *Ward* v. *Smith,* 7 Wall. 447, 452; *Conn* v. *Penn,* 6 Fed. Cas. No. 3104, pp. 282, 291; *Yeaton* v. *Berney,* 62 Ill. 61, 63; *Gates* v. *Union Bank,* 12 Heisk. (Tenn.) 325, 330. The allowance of interest made by the Circuit Court of Appeals was just and is sustained.

7. The seller agreed to deliver the ore free on board cars at the buyers' smelting works at Bartlesville, Oklahoma, or at such other works as the buyers might designate, and any difference of freight charges between the point of shipment and other smelting works so designated as against those to Bartlesville should be for the account of the buyers. The ore which was rejected by the buyers and resold was shipped to Altoona, Kansas. The freight rates were graduated on the basis of "actual value" of the ore shipped and were the same from Kennett, California, to Altoona as to Bartlesville. The rates on the shipments to Bartlesville were based on the prices fixed by the contract in suit; and those on shipments made to Altoona on the resale prices. The charges for the transportation of ore resold were $42,201.50 less than they would have been if based on prices fixed by the original contract. The master reported that if the ore had been shipped under the contract the carrier, for the lack of any other available standard, would have based its rates on the contract prices. And he excluded from the amount fixed as damages the excess over the charges actually paid. His report was adopted by the trial court, and its decision was affirmed by the Circuit Court of Appeals. The plain-

---

[2] Restrictions on intercourse between citizens of this country and citizens of Germany were removed by War Trade Regulation No. 814, July 20, 1919. See *Ward* v. *Smith,* 7 Wall. 447, 452.

tiff on his appeal contends that under the Interstate Commerce Act there cannot be two freight rates in effect at the same time between the same points on the same commodity dependent upon the invoice under which it is shipped, and that the courts below erred in making the deduction. But we think that the question whether rates that might be so produced would be unlawful was not involved in the case. The ore covered by the original contract was not shipped from Kennett to Bartlesville and Altoona at the same time, nor would it have been if there had been no breach; and it was not shown that any other zinc ore was so moved. If different rates had been exacted for contemporaneous transportation of ore to the same destination, or its equivalent, a question between the carrier and shipper might have arisen. But on the facts of this case no such question was involved. The cost of transportation on the resale was less than it would have been if the buyers had accepted all the ore. Both courts so found. The seller was not entitled to charge against the buyer anything on account of the expense of resale in excess of the amount it paid. It was not entitled to be put in a better position by the recovery than if the buyers had fully performed the contract. Plaintiff's appeal is without merit.

*Decree affirmed.*