ALEX E. LEVIN, Landlord, *v.* JOHN MEDE, Tenant.
ALEX E. LEVIN, Landlord, *v.* JOSEPH CLARK, Tenant.
ALEX E. LEVIN, Landlord, *v.* RICHARD KING, Tenant.
ALEX E. LEVIN, Landlord, *v.* PATRICK CASSIDY, Tenant.
ALEX E. LEVIN, Landlord, *v.* THOMAS EALES, Tenant.

Municipal Court of the City of New York, Borough of Brooklyn,
August 23, 1947.

*Milton M. Karpel* for landlord.

*Greenbaum, Wolff & Ernst* for tenants.

FRANK, J. The decision herein depends upon an interpretation of paragraph (4) of subdivision (a) of section 209 (U. S. Code, tit. 50, Appendix, § 1891 *et seq.*), also known as the Housing and Rent Act of 1947), which reads as follows: " * * * (4) the landlord seeks in good faith to recover possession of such housing accommodations for the immediate purpose of substantially altering, remodeling, or demolishing them and replacing them with new construction, and the altering or remodeling is reasonably necessary to protect and conserve the housing accommodations and cannot practically be done with the tenant in occupancy, and the landlord has obtained such approval as may be required by Federal, State, or local law for the alterations, remodeling, or any construction planned * * *."

The facts are practically conceded, the only real dispute being the inferences to be drawn from the testimony.

The landlord herein commenced these proceedings against five tenants occupying apartments in two similar and contiguous buildings known as 499 and 501 St. Johns Place, Brooklyn. Each of the buildings originally consisted of six five-room apartments without central heating. Four of these tenants pay a monthly rental of $26 and the fifth pays $25.

The testimony on behalf of the landlord indicates that he intends, if successful here, to remodel these five apartments and the remaining unaltered ones, by converting each old unit into two smaller apartments with a common kitchen. In addition, central steam heating is to be installed, together with new kitchen, bathroom and lighting fixtures.

The landlord urges that the alteration cannot be practicably done with the tenants in occupancy, because it is necessary to remove all the present bathroom facilities, and new installations will take several weeks. The tenants dispute this and contend that some apartments have already been remodeled without ousting the occupants. They also indicated that they would be willing to suffer some temporary inconvenience, and questioned the length of time required to replace the plumbing system.

This court finds that the plumbing, heating and electrical systems can be replaced and altered with the tenants in possession, although the work done in this manner would undoubtedly

be more expensive and more inconvenient to the landlord. The determination in these summary proceedings is not based, however, upon this proposition.

Some apartments, not directly involved in these proceedings, have been remodeled. The landlord decided after alteration to equip these new units with furniture, and has rented them as furnished apartments at an average rental of $15 per week, including gas and electricity.

Assuming that the two buildings, before any apartments were remodeled, had been fully occupied at the same rentals as the five units under consideration here, the gross income was approximately $3,700 per year. The cost of alteration of both buildings, from the testimony, would be approximately $14,000. If the landlord succeeds in obtaining possession of the apartments which are involved in this litigation, he will have a total of twenty-four units which, if rented at the same average price as those already remodeled, i.e., $15 per week, will produce a gross annual income of approximately $18,700.

These figures clearly demonstrate that the acute shortage of housing accommodations results in the payment of excessive rentals for quarters which are not protected by laws designed to limit or control maximum rents. In this instance, such excessive rentals would return his capital investment to the landlord in approximately one year. This is five times as fast as the write-off of capital investment permitted during the war in order to encourage industry to speed up production of vital war material.

The largest number of buildings which can be profitably altered or remodeled are old tenements. It is upon the occupants of this type of dwelling that the shortage of housing accommodations and rent increases fall with overwhelming oppressiveness. It was primarily to protect these low income groups that subdivision (b) of section 201 declares: " * * * that an emergency exists and that, for the prevention of inflation and for the achievement of a reasonable stability in the general level of rents * * * it is necessary * * * to impose certain restrictions * * *."

The clause " and the altering or remodeling is reasonably necessary to protect and conserve the housing accommodations " found in paragraph (4) of subdivision (a) of section 209 of the Housing and Rent Act of 1947, is new and was not contained in paragraph (5) of subdivision (a) of section 6 of the Rent Regulation for Housing in the New York City Defense-Rental Area (8 Federal Register 13918) under the Emergency

Price Control Act of January 30, 1942, and the amendments and extensions thereof (U. S. Code, tit. 50, Appendix, § 901 *et seq.*).

The addition of these words is significant. That it was intended by Congress as an additional limitation and restriction of the right of a landlord to dispossess tenants would seem to be implicit in the wording.

Law dictionaries and those for general use define each of the words " conserve " and " protect " with marked similarity. Thus, the Oxford English Dictionary, New Standard Dictionary (Funk and Wagnalls) and Corpus Juris all define " conserve " as " to preserve in its existing state, from change or destruction ". Corpus Juris defines " protect " as " to preserve in safety ", while the Oxford English Dictionary defines it as " to preserve intact, * * * to keep safe, take care of ".

The rule is well established that words of common usage should be given their usual and ordinary meaning or signification according to approved usage. (*Miller* v. *Robertson,* 266 U. S. 243; *Allen* v. *Mossman,* 46 F. 2d 891; *United States* v. *Brunett,* 53 F. 2d 219.)

The basic principle is that if a statute is plain, certain and free from ambiguity, a bare reading suffices and interpretation is unnecessary. (*Helvering* v. *St. Louis Southwestern Ry. Co.,* 84 F. 2d 857; *People ex rel. Twenty-third St. R. R. Co.* v. *Commissioners of Taxes of City of N. Y.,* 95 N. Y. 554.)

Specifically, the landlord's testimony established that there were no violations placed by any city department against the buildings in question. The houses are not unsafe, nor are they fire hazardous. The only inference possible leads to the irresistible conclusion that the structures are habitable, and except for deterioration from ordinary wear, can continue to serve as adequate housing accommodations.

Analyzing the section in this light, it is inescapable that these tenants can be dispossessed only if the premises in question are a hazard to the health and safety of the occupants or the surrounding area and the altering or remodeling cannot be performed with the tenants in possession.

Final orders will, therefore, be entered for the tenants on the merits in each proceeding, in accordance with this opinion.