**UNITED STATES v. BAROWSKY.**

Civ. No. 8389.

United States District Court
D. Massachusetts.

June 1, 1950.

The following is the Report of Charles A. Haskins, Master:

### Introduction

This is a suit for breach of contract brought by the United States against Nathan Barowsky who does business un-

der the firm name of American Machinery Company. Defendant resides and conducts a business in that section of Chicopee, Massachusetts, known as Willimansett.

By order of Court dated January 18, 1950, a Special Master was appointed to hear the parties and all evidence material to the issue and to report his findings of fact and conclusions of law. Hearings were scheduled to begin on March 17, 1950, but at the request of counsel for the Government and with the consent of defendant's counsel hearings were postponed to April 21, 1950, on which day hearings began at 10:00 a. m. and were completed at 4:50 p. m.

### Findings of Fact

1. On March 1, 1945 the United States owned 651 wooden boxes, size 124 x 14¾ x 14½ inches.

2. The A. W. Burritt Lumber Company had its principal office in Bridgeport, Connecticut, where it also maintained a lumber yard. It maintained another lumber yard at Stratford, Connecticut, at a distance of 3½ miles from its Bridgeport premises.

3. From March 1 till about the end of July 1945 the United States stored 619 of its boxes at the Stratford lumber yard of the A. W. Burritt Lumber Company. Another 32 of the boxes were stored at the Frank Miller Lumber Company in Bridgeport.

4. The Redemption and Salvage Branch of the Springfield (Mass.) Ordnance District of the War Department was duly authorized to sell these boxes.

5. On March 1, 1945 the Redemption and Salvage Branch sent out invitations to bid on the 651 boxes to 8 persons or firms (Ex. 1). The invitations set forth the dimensions of the boxes and stated that the boxes were located at "the Burritt Lumber Co., and the Frank Miller Lumber Yard, Bridgeport, Connecticut." It was further stated that the bids were to be submitted on the basis "F.O.B. Bridgeport, Connecticut."

6. One of these invitations was sent to the American Machinery Company, a sole proprietorship operated by Nathan Barowsky, the defendant. This enterprise was engaged in merchandising scrap and other products and had on numerous occasions submitted bids and been awarded contracts to purchase surplus or salvage items from the United States through the Springfield Ordnance District Office. From his previous surplus property purchases from the Government defendant knew that it was customary for the buyer to send a certified check for 50% of the purchase price upon award of the contract and to pay the balance when the goods were delivered.

7. Thomas A. Barowsky, the son of Nathan Barowsky, was born on June 28, 1926 and was therefore 18 years of age at the times material to the transaction in question. He was employed by his father to work in the office of the American Machinery Company. The father was away from the office much of the time and the son handled telephone calls and correspondence and was generally in charge of office work. A girl typist and bookkeeper was also employed in the office.

8. On March 19, 1945 Thomas A. Barowsky wrote a letter on the stationery of the American Machinery Company addressed to the Redemption and Salvage Branch of the Springfield Ordnance District (Ex. 2, 8). Making specific reference to the Government's invitation of March 1 to bid on the 651 boxes, the letter submitted a bid of $1.55 each on the boxes in question. This letter was signed by Thomas A. Barowsky and under his signature there was typed "American Machinery Co." This letter was duly received by the Ordnance District. I find no evidence that the effectiveness of this bid was conditioned upon the inspection by defendant of the boxes in question.

9. On March 26, 1945 the Ordnance officers responsible met at Springfield and considered the 4 bids submitted. The highest bid there considered was that purported to have been submitted by the American Machinery Company and the officers approved the sale of the boxes to the American Machinery Company at $1.55 each.

10. On March 29 Lt. Kelly of the Ordnance Department wrote a letter to the American Machinery Company stating that the Government accepted the bid of the

addressee (Ex. 3). He set forth that the boxes were located at "the A. W. Burritt Co., Stratford, Connecticut, and Frank Miller Lumber Co., Bridgeport, Connecticut." He requested the American Machinery Company to send a certified check for half the purchase price and to remove the boxes by April 9 in order to prevent the accumulation of storage charges. I find no evidence that the effectiveness of this acceptance was conditioned upon defendant's inspection of the boxes in question.

11. Nathan Barowsky took no action.

12. During the period from April 3 to June 1 the Government sent a number of letters to American Machinery Company urging it to send in the required 50% part payment and to sign a formal written contract which the Government customarily employed in disposing of property through the Springfield Ordnance District. This formal written contract [a copy of which appears as Ex. 7] contained many additional terms and conditions not embodied in the invitation, "offer" and "acceptance". No replies were received by the Government from American Machinery Company. On at least one occasion Lt. Kelly and one Corporal Danis of the Ordnance Department called at the office of the American Machinery Company. Nathan Barowsky was out, but they talked with Thomas A. Barowsky and urged him to see that the transaction was completed. During this period various officers of the Ordnance Department also telephoned the American Machinery Company, but they were always told that Nathan Barowsky was not on the premises.

On June 1 the Government sent a letter (Ex. 6-A21) to the American Machinery Company stating that unless the executed written contract and a certified check were received in the Springfield Ordnance Office by noon on June 5, the Government would dispose of the property and hold defendant responsible for any loss.

13. Nathan Barowsky knew of the Government's original invitation to bid on these boxes; he knew of the bid submitted by his son; he knew of the acceptance returned by the Government. Moreover, he either read or was apprised of the contents of the various communications sent by the Government to the American Machinery Company in connection with this transaction.

14. One "Snap" Greenberg was a business associate of Nathan Barowsky's, although it does not appear that he was a partner in the American Machinery Company. Greenberg was accustomed to spot merchandise which might make profitable purchases for Nathan Barowsky and was paid a finder's commission by Barowsky. Greenberg was conversant with the transaction involving these boxes.

15. On June 5, 1945 Nathan Barowsky sent Greenberg to the Ordnance District Office where he attended a meeting with Ordnance officers to discuss the American Machinery box transaction. It does not appear that Greenberg had any authority from Nathan Barowsky other than to act as messenger. Greenberg assured the Government officers that a check and a signed formal contract would be forthcoming within 24 hours. Defendant did nothing.

16. Nathan Barowsky testified on the stand that he never considered he was under any contractual obligation to the Government in connection with these boxes.

17. On June 6, 1945 the Government, which had not heard from defendant, readvertised the boxes for bids and sent invitations to some 20 prospective purchasers; among these was L. Grossman & Sons, Inc.

18. To these invitations the Government received three replies: one firm expressed lack of interest; one firm bid $.25 a box; and Grossman submitted a bid of $.51 a box. I find the market value of these boxes in June 1945 to be $.51 each.

19. On June 29 the sale to Grossman was approved by the Government; Grossman was notified of the Government's acceptance of its bid on July 5 and in due course Grossman paid the Government $332.01 for the boxes.

20. The boxes were removed from the Burritt and Miller premises by Grossman's agent the end of July 1945.

21. The A. W. Burritt Lumber Company submitted a bill to the Government for storage charges on 612 of the 619 boxes cover-

ing the period April 1 through July 15, 1945 in the amount of $321.30 which was duly paid by the Government. [While Ex. 9 was offered and received in evidence only for the limited purpose of showing that the boxes were at the Stratford plant of the Burritt Company during the period in question, Finding 21 is based upon the oral testimony of the witness Stowe, to which no objection was taken.]

### Conclusions of Law

1. Thomas A. Barowsky was the agent of the defendant for the purpose of entering into a contract to purchase these 651 boxes. He was either authorized by apparent authority or his father ratified his actions. Restatement, Agency, § 94. See Friend Lumber Co. Inc. v. Armstrong Building Finish Co., 276 Mass. 361, 369, 177 N.E. 794, 80 A.L.R. 599; Thayer v. White, 12 Metc. 343.

2. Defendant made a valid offer which was accepted by the Government in its terms. One of the terms was "F.O.B. Bridgeport, Connecticut."

To be sure, the invitation to bid set forth that the boxes were located at the Burritt Company and the Frank Miller Lumber Yard in *Bridgeport* whereas the acceptance referred to the location of the boxes at the Burritt Company in *Stratford* and the Frank Miller Company in Bridgeport. However, since there is only one set of boxes in question, the location of the boxes is of no importance from the standpoint of identity. Nor is the mention of Stratford in the acceptance inconsistent with the invitation, for the Burritt Company had its main office in Bridgeport with a branch lumber yard in Stratford. Thus the Stratford designation is but a particularization of a previously indicated more general location.

Since the Stratford yard of the Burritt Company was but 3½ miles away from the company's Bridgeport premises, this difference in location may well be too trivial to have any effect upon the buyer's cost of taking delivery. If the difference between Bridgeport delivery and Stratford delivery did effect the buyer's delivery cost, that fac-

tor is immaterial from the contract standpoint since the basis "F.O.B. Bridgeport" is a price term of the contract. Thus the buyer could either compel the seller to pay the cost of transportation from Stratford to Bridgeport or else the buyer could deduct such transportation cost from the purchase price in accordance with generally accepted business practice. See Pond Creek Mill & Elevator Co. v. Clark, 7 Cir., 270 F. 482, 486.

3. I deem it immaterial that the formal written contract which plaintiff tried to get defendant to sign introduced new terms. Without defendant's signature or consent that document is of no legal effect.

4. I therefore find that there was a valid, binding contract entered into between the United States and defendant for the sale of 651 boxes for a total price of $1,009.05.

5. Defendant broke the contract and the Government is entitled to damages unless the Statute of Frauds operates as a defense.

6. An interesting question arises as to what Statute of Frauds to apply. Since this is not a diversity case, there is no compulsion under the rule of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, 114 A.L.R. 1487, to refer to the law of the state where the federal court happens to be sitting. This is a suit by the United States on a government contract so that federal law governs, cf. Union Fish Co. v. Erickson, 248 U.S. 308, 39 S.Ct. 112, 63 L.Ed. 261, and "it is for the federal courts to fashion the governing rule of law according to their own standards." Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 63 S.Ct. 573, 575, 87 L.Ed. 838; Cf. United States v. County of Allegheny, 322 U.S. 174, 64 S.Ct. 908, 88 L.Ed. 1209; see Mr. Justice Jackson, concurring, in D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp., 315 U.S. 447, 465, 62 S.Ct. 676, 86 L.Ed. 956; 55 Yale L. J. 267, 284.

With the widespread adoption of the Uniform Sales Act which has now been passed in 37 states, it may be that Section 4 of that Act can be deemed a proper source of reference for fashioning the federal law as

to the Statute of Frauds applicable to a federal contract of sale; and while this might lead to bizarre results in some of the western states which have not adopted the Act, still it would perhaps not be unfair to apply its provisions to a sale in the District of Massachusetts whose inhabitants have been operating under the Sales Act Statute of Frauds, Mass.G.L. (Ter.Ed.) c. 106, § 6(1), since 1908. That Act provides: § 6(1) "A contract to sell or a sale of any goods or choses in action of the value of five hundred dollars or more shall not be enforceable by action unless the buyer shall accept part of the goods or choses in action so contracted to be sold, or sold, and actually receive the same, or give something in earnest to bind the contract, or in part payment, or unless some note or memorandum in writing of the contract or sale be signed by the party to be charged or his agent in that behalf."

Yet even if the federal common law in the form it bore at the time of the formation of the Union be referred to, recourse would then be had to the common law of England as embodied in its Statute of Frauds of 1677, 29 Car. II, c. 3, which provided: "XVII. And bee it further enacted by the authority aforesaid That from and after the said 'fower and twentyeth day of June noe Contract for the Sale of any Goods Wares or Merchandises for the price of ten pounds Sterling or upwards shall be allowed to be good except the Buyer shall accept part of the Goods soe sold and actually receive the same or give something in earnest to bind the bargaine or in part of payment, or that some Note or Memorandum in writeing of the said Bargaine be made and signed by the partyes to be charged by such Contract or their Agents thereunto lawfully authorized."

Thus whether the Sales Act Statute of Frauds with its $500 minimum or the English Statute of Frauds with its limit of £10 be applied, it is inescapably clear that the amount of the contract in suit comes within a Statute of Frauds which requires a memorandum in writing signed by the party to be charged.

I hold that the offer signed by Thomas A. Barowsky as agent for defendant, which incorporates by reference the invitation by the Government, constitutes a sufficient memorandum to satisfy the requirements of the Statute of Frauds.

7. The Government has fulfilled its duty of mitigating damages.

8. One element of damages to which the seller is entitled is the difference between the contract price and the market price of the goods at the time of breach. On this basis the Government is entitled to recover $1,009.05 minus $332.01 (651 times $.51) or $677.04.

9. The Government is also entitled as consequential damages to such reasonably foreseeable damages as were within the contemplation of the parties. This element might well include reasonable storage charges, but the Government has not sustained the burden of showing what storage charges were a direct consequence of the breach. The payment for storage charges of $321.30 made to the A. W. Burritt Lumber Company embraced a period commencing on April 1, 1945, before defendant could have been expected to remove the boxes even had he performed the contract. The Government's acceptance of defendant's bid was dated March 29, 1945, and applying the criterion of a reasonable time, the earliest defendant could be expected to remove the boxes would be some time after April 1. Moreover, in its acceptance the Government suggested April 9, 1945 as a removal date and stated that an existing storage agreement with the lumber companies terminated on that date. Thus it would be impossible to ascribe as damages flowing from the breach of contract storage charges accruing prior to April 9. I therefore disallow storage charges as an element of damages.

10. Judgment should be entered for plaintiff in the amount of $677.04.

Edward F. McLaughlin, Jr., of Boston, Asst. U. S. Atty., for plaintiff.

Harry Zarrow, of Worcester, Mass., for defendant.

WYZANSKI, District Judge.

This case is before me on plaintiff's motion for confirmation of the master's report and defendant's objections to that report.

■ Defendant's counsel stated in open court that the only question *he* intended to raise was whether plaintiff's purported acceptance so varied from defendant's offer that there was no contract. Defendant's precise point is that he offered to buy boxes located at Bridgeport on the basis "F.O.B. Bridgeport", whereas the Government replied that it "will * * * accept * * * for boxes * * * located at Stratford * * * and Bridgeport."

From the findings made by the master it appears that the parties had agreed on every material term of a contract, including identity of the goods, price, who should pay the freight and from what point it should be computed. Perhaps they had even agreed as to where the boxes were actually located—for defendant had incorporated in his offer the terms of an invitation stating that some of the boxes were at the Frank Miller Lumber Yard in Bridgeport and the other boxes were at the Burritt Company, whose location was not stated, but which in fact had an office in Bridgeport and a lumber yard in Stratford. But whether they had agreed on the location of the goods or not is of no significance. For wherever the goods were located defendant had offered to pay the freight from and only from Bridgeport. The location of the goods was not a "term" of the offer. And the terms of the offer were unequivocally accepted by plaintiff. Hence there was the manifestation of assent necessary for the formation of a contract. Restatement, Contracts, § 58. Cf. Newspaper Readers Service v. Canonsburg Pottery Co., 3 Cir., 146 F.2d 963, 965.

There remains the question raised by the Government as to whether the Court should allow interest, and if so from what date and at what rate, upon the amount of $677.04 found by the master to be the difference between the contract price and the market price of the goods at the time of breach.

■ The right to recover interest as damages for delayed payment of a contractual obligation to the United States rests in the equitable discretion of the judge, uncontrolled by statute or ironclad judicial decisions. Royal Indemnity Co. v. United States, 313 U.S. 289, 296-297, 298, 61 S.Ct. 995, 85 L.Ed. 1361; United States v. Conti, D.C.D.Mass., 64 F.Supp. 187, 190.

■ In the instant case at least three equitable rules are possible for determining whether, and if so from what date, interest is recoverable. The first rule would be that no interest should be allowed because until the trier of fact found the fair market value of the boxes the damages were unliquidated and were not susceptible of ascertainment by computation or reference to a well-established market. Faber v. City of New York, 222 N.Y. 255, 118 N.E. 609. The second rule would be that interest should be allowed from June 5, 1945, the final date set by the Government for payment by defendant of the price of the boxes. The theory for this rule would be that, further postponements having been denied, the defendant was obligated to pay a definite sum of money on that day (Restatement, Contracts, § 337) and that defendant is being sued for that agreed amount less the undetermined market value of the boxes. Compare Restatements, Contracts, § 337 comment (h) and example 6. It is said in support of this theory that the parties had agreed upon a definite sum to be paid on a definite date and even though there was on that date an uncertainty as to how much difference there was between the known value of defendant's promise and the unknown value of plaintiff's goods, "the party not performing should not deprive the party not in fault of the use of his money without paying therefor." J. B. Preston Co. v. Funkhouser, 261 N.Y. 140, 145, 184 N.E. 737, 739, 97 A.L.R. 459; applying N.Y. Civil Practice Act, § 480, adopted 1927. The third rule would be that interest should be allowed from the date of the complaint. Miller v. Robertson, 266 U.S. 243, 257, 45 S.Ct. 73, 69 L.Ed. 265; Hawkins v. Jamrog, 277 Mass. 540, 545, 179 N.E. 224, 79 A.L.R. 979. The reason given for this rule by Chief Justice Shaw was that "judgment has necessarily been delayed to await the action of the law. In actions of assumpsit, interest is computed from the date of the writ to the time of the assess-

ment, on demands not bearing interest by contract or usage, or by any rule of positive law; because from that time the plaintiff is delayed of his due, without fault or want of diligence on his part." Williams v. President, etc., of American Bank, 4 Metc. 317, 323, 45 Mass. 317, 323.

Of these three rules the second one seems to me the fairest to apply in the case at bar. Defendant's withholding of money adversely affected the plaintiff from the date it was due. Theoretically, at least, from that date plaintiff may have been forced by defendant's action to go out and borrow money. And allowance of interest on that basis is recognized by modern statutes (see for example the Law Reform Act, 1934, 24 & 25 Geo. V, c. 41 § 3 and N.Y.Civil Practice Act, § 480). Indeed refusal to allow such interest seems according to Williston, Contracts, Rev.Ed. § 1413, p. 3940 "based on practice rather than on theoretical grounds."

▆▆▆ The final problem is the rate of interest. While, as the Royal Indemnity case teaches, a rate corresponding to the local statutory rate of 6% is permissible [See 313 U.S. at page 297, 61 S.Ct. at page 998], I share the views of Justices Black and Douglas that "a smaller rate would appear to come nearer to harmonizing with fair and equitable interest exactions." [See 313 U.S. at page 298, 61 S.Ct. 995, 998.] This Court takes judicial notice of the fact that plaintiff can and for some time has been able readily to borrow money at very low rates of interest. And capacity to borrow at a low interest rate is relevant since, as stated in the preceding paragraph, the only purpose in allowing interest in this case is to compensate plaintiff for defendant's having forced it to borrow or forego the use of money. Taking this factor into consideration, I have determined to limit the Government to a 4% interest rate.

Defendant's exceptions to master's report overruled.

Master's report confirmed.

Judgment to enter for $677.04 together with interest at 4% from June 5, 1945 to date of judgment and costs.