**STURCHLER v. SUTHERLAND, Alien Property Custodian, et al.**

District Court, E. D. New York. March 22, 1927.

No. 2691.

1. War ⊂⊃12—Administrator, suing to recover property seized by Alien Property Custodian, must show legal basis for suit (Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1 [Comp. St. § 3115½e]).

Administrator, suing in equity under Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1 (Comp. St. § 3115½e), to recover property seized by Alien Property Custodian prior to owner's death, must show legal basis for the suit, such as the necessity for payment of decedent's debts, or distribution of estate to those legally entitled thereto.

2. Constitutional law ⊂⊃70(1)—Federal court, even in equity, should not transgress statutes, and cannot legislate directly, and should hesitate to do so indirectly.

Federal court, even in applying equity, must not and should not transgress express federal statutes, and cannot legislate directly, and should hesitate to do so indirectly.

3. War ⊂⊃12—Eligible claimant to property seized by Alien Property Custodian is one not a German citizen, or woman becoming German citizen by marriage prior to April 6, 1917 (Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1, subsecs. [a], [b], par. [3], and subsecs. [c], [d], [g], being Comp. St. § 3115½e).

Under Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1, subsecs. (a), (b), par. (3), and subsecs. (c), (d), (g), being Comp. St. § 3115½e, an eligible claimant to property seized by the Alien Property Custodian is one not a German citizen whose property has been seized, or who, being a woman, became a German citizen by marriage prior to April 6, 1917, if property so seized had not been acquired by her directly or indirectly from a citizen of Germany subsequent to January 1, 1917.

4. War ⊂⊃12—Enemy property seized by Alien Property Custodian constitutes trust fund for settlement of claims of American citizens against former enemy (Trading with the Enemy Act [Comp. St. § 3115½a et seq.]).

Original purpose of Trading with the Enemy Act (Comp. St. § 3115½a et seq.), as respects seizure of enemy property in order to prevent use thereof to aid enemy during war, was changed by subsequent amendatory acts, and property seized is now deemed a trust fund, to be held as security of claims of American citizens against the former enemy, and it is for Congress, and not for the courts, to decide from time to time how this trust fund shall be administered, and the government has not waived its rights to such fund.

5. War ⊂⊃12—Whether privilege given to next of kin, who is citizen, to claim property seized by Alien Property Custodian, should be extended to German citizen, is for Congress, and not for court (Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1 [Comp. St. § 3115½e]).

Whether the privilege given to a next of kin, who is a citizen of the United States, to claim decedent's property seized by Alien Property Custodian, under Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1 (Comp. St. § 3115½e), should be extended to include one who is a citizen of Germany, is a question for Congress, and not for the courts.

6. Statutes ⊂⊃209—Use of different language in two subsections of same statute should be given due weight in determining intent of Congress.

Use of different language in two subsections of the same statute should be given due weight in determining the intent of Congress.

7. War ⊂⊃12—Deceased American citizen's daughter, who was citizen of Germany by marriage, held not eligible claimant, by inheritance, of decedent's property seized by Alien Property Custodian (Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1, subsecs. [a], [b], par. [3], and subsecs. [c], [g], being Comp. St. § 3115½e).

Where property of American citizen residing in Germany, acquired by her in accordance with Trading with the Enemy Act, § 9, as amended by Act March 4, 1923, § 1, subsec. (b), par. (3), being Comp. St. § 3115½e, was seized as enemy property by Alien Property Custodian before her death, her daughter, who was a citizen of Germany by marriage to German citizen, not being owner of property when it was seized, held not an eligible claimant by right of inheritance, under subsections (a), (b), (c), (g), of the amended act, and decedent's administrator therefore had no right to distribute property to her.

8. War ⊂⊃12—Sole remedy to recover property seized by Alien Property Custodian is by proceeding under statute (Trading with the Enemy Act, as amended [Comp. St. § 3115½a et seq.]).

The sole remedy of one claiming property seized by Alien Property Custodian under Trading with the Enemy Act, as amended (Comp. St. § 3115½a et seq.), is by proceeding under the statute.

9. Judgment ⊂⊃670—Dismissal of suit by administrator, as assignee to his intestate's donee, to recover property from Alien Property Custodian, held not res judicata in subsequent suit as administrator under statute (Trading with the Enemy Act, § 9, as amended Act March 4, 1923, § 1, subsec. [d], being Comp. St. § 3115½e).

Dismissal of suit brought by administrator as alleged assignee to alleged donee of his intestate to recover property from Alien Property Custodian, which property he failed to show belonged to the estate, held not res judicata in his subsequent suit as administrator under Trading with the Enemy Act, § 9, as amended

by Act March 4, 1923, § 1, subsec. (d), being Comp. St. § 3115½e.

In Equity. Suit by Theophile Sturchler, as administrator of the estate of Martha Elizabeth Peipers, deceased, against Howard Sutherland, as Alien Property Custodian, and another. Complaint dismissed without prejudice.

Barnes, Avery & Whiting, of New York City, for plaintiff.

William A. DeGroot, U. S. Atty., of Brooklyn, N. Y. (Thomas E. Rhodes and Dean Stanley, Sp. Asst. Attys. Gen., of counsel), for defendants.

R. R. Loening, of New York City (Myron Scott, of New York City, of counsel), amicus curiæ.

INCH, District Judge. This is a suit in equity by plaintiff, as administrator of the estate of Martha Elizabeth Peipers, deceased, under the Trading with the Enemy Act (Act Oct. 6, 1917, c. 106, § 1, 40 Stat. 411, as amended). Jurisdiction over subject-matter and person appears.

Plaintiff seeks to recover certain personal property, such as bonds, etc., which belonged to said deceased at the time of her death, and was duly seized by the Alien Property Custodian prior to her death. Apparently (at least there has been no effort to prove to the contrary) there are no debts, etc. The sole purpose of the administrator in bringing the suit is to receive the property, in order to distribute it to an heir at law and the next of kin. There has been no proof of any will. This sole heir at law and next of kin is a daughter, Kate Von Reichenau, who was born in the United States on September 30, 1868, and while a citizen of this country married, on October 10, 1891, in Germany, a German subject, Franz Von Reichenau. She is a German citizen.

If plaintiff's intestate, Martha Elizabeth Peipers, was alive, she could reclaim the property. Mrs. Peipers was born in 1844 in New York City; both her father and mother were native-born citizens and residents of the United States. In 1867, in the city of New York, she married Hugo Peipers, a German subject, and he, in 1872, became an American citizen. Mr. and Mrs. Peipers continued to live in this country for some time, during which time the above-mentioned daughter was born. Later, and long before the war, Mr. and Mrs. Peipers went to Germany, and continued to reside there until their death. Mr. Peipers died in 1898, and Mrs. Peipers died in 1922. Mrs. Peipers acquired the property in question in accord-

ance with the provisions of Act March 4, 1923, c. 285, § 9, subsec. (b), par. (3), being Comp. St. § 3115½e.

Their daughter Kate had gone with them from this country to Germany, and had continued to reside with them in Germany, where she subsequently married Franz Von Reichenau. So far as I can see, she still resides abroad. There is nothing to indicate that she has reclaimed her American citizenship, though this would be immaterial after 1918. The sole question, therefore, comes down to this: Whether or not the said daughter is and would be eligible as a claimant under subsection (a) or (c) of section 9.

[1] An administrator, in such a suit as this, must show some legal or proper purpose as the basis for the suit, such as the necessity for the payment of the debts of decedent, etc., or distribution of the estate to those legally entitled thereto. It would be an idle ceremony to simply direct the property to be paid to him, and then at the same time compel him to at once restore it to the Alien Property Custodian, because there were no debts, etc., and no one to whom it could legally be distributed.

Under such conditions, the property might as well stay where it is, pending further legislation by Congress as to its disposition. In some instances to do otherwise might even mean depletion of the estate eventually to belong to a distributee.

The plaintiff contends that Kate Von Reichenau would be and is an eligible claimant, because she is "a woman who at the time of her marriage was a citizen of the United States, and who prior to April 6, 1917, intermarried with a citizen of Germany, and the property was not acquired by her directly or indirectly from any German citizen subsequent to January 1, 1917. Subsection (b), par. (3).

It is unnecessary at this late day to discuss the purpose, etc., of the various provisions of the Trading with the Enemy Act as amended. Suffice it to say that Congress legislated according to the demands of the times, being careful not to thereby legalize or validate any act or transaction which otherwise or elsewhere would be void, illegal, or invalid. Section 7 of the original Act Oct. 6, 1917 (Comp. St. § 3115½d). Congress also was careful to say the sole relief and remedy of any person having any claim to any money or other property heretofore seized shall be that provided by the terms of the act.

Congress has continued to legislate, as circumstances seemed to require, as shown

by the various amendments. Legislation necessarily is slower than the progress of a busy people in their daily work away from the days and demands of a great war period. It is the result of a supposed need. Such need arises when its justness or necessity has finally found lodgment in the minds of a group, large or small, organized or noisy, sufficient, however, to initiate the presentment of that need to a legislative body.

[2] The federal court is created and governed by statutes. Even the application therein of equity must and should not transgress an express federal statute. The court cannot legislate directly, and should hesitate to do so indirectly. Whether or not in equity this daughter should have her mother's property, the fact that the daughter was born here, as well as her mother, and that her citizenship, received by being so born of American parents, has been lost simply by marriage, and like reasons naturally arising, are not to be considered, if the statutes do not allow such daughter to receive the property.

A careful reading of the act as amended shows Congress has legislated with knowledge of such conditions. The applicable sections of the present Trading with the Enemy Act should be briefly set forth:

"(a) Any person not an enemy or ally of enemy claiming any * * * property * * * seized * * * may file * * * a notice of his claim * * * and the President, * * * may order the * * * delivery to said claimant of the * * * property * * * and * * * [if suit is brought] the court shall order the * * * delivery to said claimant.

"(b) In respect of all money or other property * * * seized * * * if the President shall determine that the owner thereof at the time such * * * property was * * * seized * * * was: * * *

"(3) A woman who at the time of her marriage was a citizen of the United States, and who prior to April 6, 1917, intermarried with a subject or citizen of Germany * * * and that the money or other property, concerned was not acquired by such woman, either directly or indirectly, from any subject or citizen of Germany * * * subsequent to January 1, 1917; or who was a daughter of a resident citizen of the United States and herself a resident or former resident thereof, or the minor daughter or daughters of such woman, she being deceased—

"Then the President, without any application being made therefore, may order the

* * * delivery of such * * * property," etc.

"(c) Any person whose money or other property the President is authorized to return under the provisions of subsection (b) hereof may file notice of claim * * * as provided in subsection (a) hereof, * * * or may institute suit in equity to recover such *. * * property. * * *

"(d) Whenever a person, deceased, would have been entitled, if living, to the return of his * * * property hereunder, then his legal representative may proceed for the return of such *. * * property as provided in subsection (a) hereof: Provided, * * * that such legal representative will redeliver to the Alien Property Custodian such portion of the * * * property so received by him as shall be distributable to any person not eligible as a claimant under subsections (a) or (c) hereof. * * *

"(g) The legal representative * * * of a person, deceased, whose * * * property has been * * * seized * * * may (if not entitled to proceed under subsection [d] of this section) proceed under subsection (a) for the recovery of any interest, right, or title in any such * * * property which has, by reason of the death of such person, become the interest, right, or title of a citizen of the United States, unless such citizenship was acquired through naturalization proceedings in which the declaration of intention was filed after November 11, 1918, * * * conditioned that he will redeliver * * * all * * * property not distributed to such citizen, or, if deceased, to his heirs or legal representatives."

[3] Thus we see, in reading the above sections and applying same to the facts of this case, that Congress has provided that an eligible claimant is one whose property has been seized and is not a German citizen, or is a woman who is a German citizen, but who originally was a citizen of the United States, and became such German citizen by marriage prior to April 6, 1917, and her property so seized had not been acquired by her directly or indirectly from a citizen of Germany subsequent to January 1, 1917.

We are not concerned with the rights of German citizen owners to recover their property so seized up to $10,000, as such provision is not here applicable. We also see that, if such owner has died, his or her administrator or executor may make a claim for the estate, for the purpose of paying decedent's debts, etc., and that Congress has gone a step further in providing that, where

an heir at law or next of kin, or other distributee, could be on the facts himself an eligible claimant, as above provided, then the claim can be made by such representative, for the estate (for the purpose of paying the debts, etc.) and such distributee, and the property thereafter distributed with the same force and effect as if the claim had been made by such distributee.

This avoided the necessity of our government becoming involved in many collateral matters incident to the settlement of an estate, such as construction of a will and the provisions of various inheritance laws. All the administrator of such an estate had to do would be to present the facts defining an eligible claimant, and such facts could be easily and definitely proved. The test, therefore, is whether or not the sole distributee in this case could be an eligible claimant.

There are three important provisions as to such claimant: First, the ownership of the property seized at the time it was taken and became a part of the fund; second, the citizenship of the prior owner and the time when it was acquired by the person who owned it when it was seized; third, the conditions of fact, such as sex, marriage, loss of United States citizenship, etc. It would appear that, unless all of these provisions are met in accordance with the statute, there is no eligible claimant and no distributee to whom the property can be distributed lawfully.

Because it is here contended that "the decision of great many controversies and awards as to property now held by the Alien Property Custodian may be affected by this decision, and that very large sums of money are involved in these pending controversies," a brief has been submitted by an amicus curiæ, in addition to the excellent briefs submitted by counsel for plaintiff and for the government. For the above reason the court has examined the question with extreme care, and to the best of its ability, most carefully considering the contentions of the various parties. This must be considered as the excuse for what otherwise might be considered an unnecessarily long opinion.

At the outset the case is made difficult by the natural feeling, strongly urged by counsel for plaintiff, that this German citizen daughter should have her mother's property. Such and similar considerations are not for the court, but for Congress.

It is conceded that in 1918 the Alien Property Custodian seized the property of Mrs. Peipers, who died intestate in Germany December 31, 1922. Consequently the property in question was seized and became a

part of the sequestered fund prior to the death of Mrs. Peipers, and her daughter (the distributee here) was not the owner at the time of such seizure, nor in that sense was any of her property taken and made a part of the fund. We are therefore not dealing with any question that may be raised where a seizure has taken place after the death of the original owner of the property at the time of the seizure.

With the above understanding as to the facts and the issues, it may be well to briefly mention the various contentions of the counsel in the case. The plaintiff contends that the securities in question are clearly identified and their ownership established; that the phrase "a person not eligible as a claimant," as contained in subsection (d), is one without the requirement of ownership set forth in the introductory clause of subsection (b); that subsection (d) is operative in all cases where the decedent, if living, would have been entitled to the return of his property, and that manifestly, *"if ownership at the time of seizure* was necessary, it would bring beneficiaries, in the majority of cases, within the ineligible class, and would render practically nugatory the intention of (d); that, if an alien enemy whose property had been seized died after such seizure, leaving all his property to nonenemy American citizens, none of such persons could receive his share." This contention evidently overlooks (g). In other words, plaintiff contends that paragraph (3) is complete in itself, and that it must *not* be read in connection with the foregoing introductory part of (b), of which it is a part and subdivision.

The brief on behalf of the amicus curiæ contends that German national distributees of owners who would have been entitled to a return, but who died after July 2, 1921 (Joint Resolution of Congress as to Peace with Germany [Comp. St. § 3115¹⁴⁄₁₅g]), are entitled to claim as *alien friends*; that sound principles of statutory construction require section 9, subsec. (d), be construed so as not to exclude German national distributees of owners who would have been entitled to the property, but who died after July 2, 1921; and that all right of the government to insist upon a construction of section 9, subsec. (d), as excluding German national distributees of owners, who would have been entitled to the property, who died after July 2, 1921, has been waived by Congress.

The government contends that the evidence does not furnish prima facie proof that the securities here sought to be recovered belonged to Mrs. Peipers at the time of their

seizure, and that her daughter is not entitled to receive the property under the provisions of the Trading with the Enemy Act as amended.

A large number of cases have been cited, but so far as I can see, or find, no case directly in point has been brought to my attention. The decision of the District Court, Southern District of New York (U. S. Trust Co. v. Hicks, 16 F.[2d] 286), refers to entirely different facts, and in addition makes the distinction between seizures where property was enemy property when seized and property which was not enemy property when seized. The property here was enemy property when seized.

Let us first see if Congress, by the express words of its various acts, has shown a definite plan. I think that such plan so appears. Congress has provided that the President or the court, as the case may be, shall have jurisdiction to order the return (subsection [b]) "in respect of all money or other property * * * seized," provided that the President (or the court) shall determine *"that the owner* thereof *at the time* such * * * property * * * *was seized" was*: "(3) A woman who at the time of her marriage," etc., or "was a daughter of a resident citizen of the United States," etc., "or the minor daughter or daughters of such woman, she being deceased." Then comes subsection (c), which declares that "any person whose * * * property the President is authorized to return," under subsection (b) can make the claim or commence suit, etc.

Finally Congress provided subsection (d), allowing a legal representative of a decedent owner to lay claim for such return *upon condition* that he shall not *distribute* the estate "to any person not eligible as a claimant under * * * (a) or (c)." We have already referred to subsection (c), which in turn refers to subsection (b). Subsection (a) relates to a person not an enemy or ally of enemy. Thus Congress, by subsections (a), (b), (c), (d), has expressed a plain and consistent plan. Each of the former subsections are made a part of and limit subsection (d). When one reads subsection (g), it clearly shows that Congress intended subsection (d) to be so confined and limited.

[4] If one considers the history of the original act of 1917 and the subsequent amendatory acts from time to time, it will appear that, while the seizure started with the idea of taking away the property of the enemy to prevent them from giving support to their government during war time (Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 69 L. Ed.

265), this purpose changed until finally it is being repeatedly considered by Congress as a *trust fund to be held as security for the settlement of claims of American citizens* against the former enemy. See extract from debates in Congress, infra.

There is no idea of confiscation, but there is this purpose of holding sufficient of the funds sequestered to meet American claims, provided same are not adjusted in some other way, and this with the express agreement of the German and United States governments. If this is so, surely it is for Congress to decide, from time to time, how this trust fund shall be diminished, rather than for the courts.

We also find that as the years went on this question received consideration of Congress, and remedial legislation was enacted, which, as the Supreme Court has said, "should be liberally construed to effect the purposes of Congress and to give remedy in all cases intended to be covered. * * * The just purpose of the section is not to be defeated by a narrow interpretation, or by unnecessarily restricting the meaning of the word 'debt' within technical limitations." Miller v. Robertson, 266 U. S. 243 at page 248, 45 S. Ct. 73, 75 (69 L. Ed. 265).

Bearing the above caution in mind, and having outlined what seems to be a definite plan of Congress, let us examine very briefly the best evidence of an intention on the part of Congress, as shown by the Congressional Record. The first real change or evidence of this remedial legislation occurs in the Act of June 5, 1920 (Comp. St. § 3115½e). This act was known as H. R. 14208; it amended section 9 of the original Act of October 6, 1917. This bill came before the House on June 3, 1920, shortly before adjourning, and the marginal quotations appear from the Congressional Record, 66th Congress, 2d Session, vol. 59, part 8, p. 8426, etc.[1] Natu-

---

[1] "Mr. Esch: Mr. Speaker, the purpose of this bill is to amend section 9 of the Trading with the Enemy Act, in order to enable the Alien Property Custodian to restore property to parties *from whom* the property has been taken. It has been found that since the armistice the status of many people whose property has been taken away or seized has changed absolutely," etc. "In order that justice may be done those people, it is found necessary for us to amend section 9, in order to authorize the Alien Property Custodian to restore the property to those who now are no longer our enemies, but are citizens of countries that are friendly to the United States. * * * We have added a new feature in reference to American-born women who married alien enemies prior to the declaration of war on the 6th of April, 1917, when such property was not derived either di-

rally I have only chosen very brief portions of the debate, sufficient, however, to show intention.

The matter in this emergency was thus left and the bill passed. From the above, which is the nearest that I can find in favor of plaintiff's present contention, it would seem that Senator Nelson had in mind that a child could recover where her mother could have recovered, although even there he mentions, "and this is property inherited from

rectly or indirectly from any German source. These are the main points of the bill." (Page 8426.)

"Mr. Blanton: There is not a single alien enemy in Germany to-day but will want his friends and relatives to get the benefit of their property, if they can. Is that the policy of this government, to pass such a law as will permit these frauds to be passed upon the rights of individuals who have good, valid, conscientious claims, etc.?" (Page 8427.) "It will wipe the estate out of the hands of the Alien Property Custodian and leave nothing to pay the claims of American citizens," etc. (Page 8428.)

"Mr. Bee: What I am seeking to get at is whether there is any occasion for the holding of property that we took over during the war, to keep it from going to the benefit of our enemies." (Page 8429.)

"Mr. Esch: I think that may have to rest on the provisions of the treaty which we make with Germany." (Page 8429.)

In the Senate there was also a debate. It came before the Senate on June 4, 1920. The bill was unanimously reported out by the judiciary committee.

"Mr. Nelson: The object of the bill is to give the people who belong to these new states, like Poland, an opportunity to come before the President and obtain the release of *their* property *that was seized* by the Alien Property Custodian. *Some* of that property *was converted* into money, *and some* of it *remains* in the hands of the Alien Property Custodian in kind. The bill provides that these people can recover *their property*. In addition to that, it covers some other cases. It covers the cases, first, of American women who before the war lost their citizenship by marrying neutrals. That is one class. Then it covers the cases of native-born American women, who married Germans or Austrians, enemy aliens. It is to give those *two classes* of women an opportunity to recover *their* property." (Page 8472.)

"Mr. McCumber: I desire to ask the Senator with reference to another class that he has mentioned. If I understand him rightly, while the German could not claim his property rights, the wife of the German, who is a German citizen, could claim such rights, provided she at one time before her marriage was an American citizen." (Page 8472.)

"Mr. Nelson: If she is a native-born American woman, and lost her citizenship either by marrying a neutral before the war or by marrying an alien enemy, such as a German, before the war, she is authorized *to regain her property, not the property of her husband*. The object is to give *American women who have married* these *foreigners* an opportunity to get back

his mother," thereby possibly meaning a condition where the seizure has taken place after the death of the mother, for he is referring to property in the fund.

However, giving it the broadest interpretation, such construction does not seem to have been concurred in by Senator Pittman or others, for the former suggested that the bill should possibly be amended so as to accomplish this result. This colloquy between

the *property that they formerly had; that is, their own exclusively.*" (Page 8472.)

"Mr. Pittman: *Does not the Senator think the bill should extend* to the heirs of the woman who would be entitled to a remedy under this bill?" (Page 8472.)

"Mr. Nelson: If the child's mother is of that class, I think the child would come in under it. If his mother belonged to that class, *and this is property* inherited from his mother, I think it would be construed that he would have a right to come in under the provisions of the bill." (Page 8472.)

"Mr. Knox: In my judgment, it is only because Germany has acquiesced, under the terms of the Versailles treaty, that property should remain in the custody of the United States for the discharge of the obligation which Germany owes to the United States, that it is defensible at all." (Page 8473.)

"Mr. King: I do not think we ought to restore to a woman who married a German and went to Germany to reside, and is still residing there, the property which was seized here, until we restore to other Germans the property of which we deprived them. I agree with Mr. McCumber that, if an American woman married a German and went to Germany prior to the war, and made it her home, and she was there during the war, so long as we retain the property of German nationals seized in the United States, we should hold such property until we return the property of German nationals, if we shall take that course, and then we should restore it to her. We ought not to discriminate." (Page 8474.)

"Mr. Nelson: The same provision applies to the other class of women, those who married alien enemies. In view of those facts, which simply relate to the property of these American women, *their own property, not the property that they acquired* in any shape or manner *from their husbands*, I appeal to the generosity of the Senator not to make any effort to amend the bill at this stage. If it was earlier in the session and we had more time, it would not be of much consequence, because it could be easily settled in conference, but now, at this time, to put an amendment on the bill would simply imperil its enactment into law." (Page 8475.)

"Mr. Nelson: Mr. President, I can readily see that the Senator from Utah is actuated by the best of purposes and motives, and were conditions different I would gladly acquiesce in the amendment, and the matter might then be disposed of in conference; but at this late stage of the session to amend the bill in a material respect would imperil its passage. In view of the great good which can be accomplished by this bill for the people * * * I trust the Senator from Utah will forego insisting on any amendment to it." (Page 8475.) Italics mine.

the Senators would hardly be sufficient basis for the court to find an expressed intention of Congress, as plaintiff now contends. On the contrary, taking the entire debate, there is no such intention; but there is a great deal of evidence showing that Congress, except in most carefully restricted instances, did not intend to relinquish any of the sequestered fund to German citizens or nonowners until the subsequent proper time had arrived.

Later by Act of February 27, 1921, c. 76 (41 Stat. 1147 [Comp. St. § 3115½e]), without any debate, another remedial step was taken. This gave an American-born woman, such as Mrs. Peipers, the right to get back her property, even though she had inherited it or acquired it from a German citizen, provided she had done so prior to January 1, 1917.

There were various other amendatory acts, of no consequence here. Finally we come to the last important act, that of March 4, 1923. 42 Stat. 1511, c. 285, § 1. This act was a most distinct step forward towards the ultimate return of the fund to German citizen owners. (The above various acts are set forth in the U. S. Comp. Statutes Supp. 1923 and Supp. 1925 under section 3115½e—National Defense.)

By this Act of March 4, 1923, property not exceeding in value the sum of $10,000 can be returned to a *German citizen, who was at the time of seizure the owner thereof.* The very fact that this statement of time of seizure is used indicates that Congress had the importance thereof in mind all the time. Here again we may with benefit turn to the Congressional Record, 67th Congress, 4th Session, vol. 64, parts 4, 5, and 6.

The bill under discussion is the Act of March 4, 1923. The bill came before the House of Representatives as the Committee of the Whole House on February 22, 1923. It was known as H. R. 14222.[2]

---

[2] "Mr. Newton: In general, the major purpose of the bill before us is to make partial return of alien enemy property seized during the war by the Alien Property Custodian under the Trading with the Enemy Act." (Page 4282, part 4.) "I feel that it is the duty of the American Congress, in all matters of legislation pertaining to this property, to bear in mind that our first duty is to safeguard and protect the rights of American claimants until the German government shall have satisfied them in full." (Page 4284, part 4.)

The minority report and the real issue, debated most fully, recommended the return of *all* property seized.

"Mr. Lanham: If there is a principle which justifies or demands the release of a part of this property, would not the application of the same

In the Senate there was considerable debate. No one reading the entire debate can escape the conclusion that, as to property owned by German citizens or nationals, Con-

principle justify or demand the release of all of the property?" (Page 4287, part 4.)

"Mr. Rayburn: That is what we ask in our minority report. If $10,000, why not $20,000? Why not $50,000? Why not $100,000? Why not all? As a matter of putting this country right before the nations of the world, I would rather this Congress would return none of the property than to return the paltry amount that it is returning." (Page 4287, part 4.)

"Mr. Temple: The privately owned property found in our territory is not to be confiscated; it is to be retained. The gentleman asks how long. Let me read from the treaty to show how long it will be retained. I am speaking of the treaty of peace between the United States and Germany (42 Stat. 1939), not the treaty of Versailles. In section 5 it says it is further provided that the property of all German and Austro-Hungarian nationals coming into the possession of the United States following the declaration of war should be retained by this government, except as provided by law, until the enemy governments shall have made suitable provision for the satisfaction of all claims arising against said government on behalf of American citizens who had suffered damages to their persons or property through the acts of the German or Austro-Hungarian government.

"The question is not whether we are going to turn back all of this property. That question is not before us. If the amendment turning all of the property back should be put into the bill, the whole bill would be lost. Men whose consciences require them to return this property now rather than to follow out the terms of the treaty will kill the whole project. I presume that [the acquisition of enough property to care for private claims] was taken into consideration during the negotiation of the treaty and when the treaty was drawn up, but the German government evidently did not think so, for it agreed to the provisions I have just read. We turn back the small claims ($10,000 and under it); why do we not turn back the larger claims? All these claims, large and small, become a question between the German government and its own nationals." (Page 4290, part 4.)

"Mr. Denison: So all the German nationals have to-day for the property that was seized is a claim against our government for its value. Now, this claim is a mere chose in action." (Page 4293, part 4.) "The joint resolution of Congress July 2, 1921, reserved for the United States and its nationals the rights accorded them under the Treaty of Versailles and the Treaty of St. Germain. The power of Congress after the war to dispose of this property as it should direct remained untrammeled as far as the Treaty of Versailles and the Treaty of St. Germain were concerned. So by solemn treaties (Treaty of Berlin, August 25, 1921; Treaty of August 24, 1921, as to Austria) we are entitled to the benefits of the provisions of the Treaty of Versailles and the Treaty of St. Germain with reference to the claims of American citizens against Germany and Austria, and with reference to the property of German and Austrian

gress intended to hold the same subject to future legislation from time to time. The Senate proposed certain amendments, which were objected to by the House. A conference was had. As a result of this conference

citizens now held by the United States and the claims of those citizens resulting therefrom." (Page 4295, part 4.)

"This bill provides for the payment of a certain amount and a very large number of the claims of German citizens against our government. We are doing this voluntarily, and as a matter of grace, without any request or any treaty requirement with the governments of Germany and Austria. We are holding the balance until the claims of American citizens against Germany and Austria can be adjusted and determined and satisfactory arrangements made for their payment." (Page 4296, part 4.)

The debate largely centered about the word "confiscation." On the following day (February 23d) the debate continued, and the issue above referred to was clearly brought before the House by a proposed amendment offered by Mr. Rayburn, proposing to strike out the words "not an enemy or ally of enemy"—Mr. Rayburn stating: "This is the amendment that provides for the return of all the property." (Page 4396, part 5.)

The question then became whether the above amendment should be adopted; in the course of the debate Mr. Newton (in charge of the bill) stated: "Gentlemen, it is unthinkable as we view the past that any one can advocate the present returning of all of this property." (Page 4406, part 5.)

Mr. Hoch then proposed a further amendment in substance as follows: "(1) With respect to such alien property held by the Alien Property Custodian, the return of which is not herein provided for, it is hereby declared that the United States has no purpose of confiscating the same, but that such property is to be held in trust for the owners thereof until its return shall be provided for by Congress." (Page 4406, part 5.)

This amendment then became the subject of the debate, but was voted down; Mr. Graham, of Illinois, stating: "It is in effect a declaration that we do not intend, under any circumstances, to hold this property, but that we propose to turn it back, every cent of it, in spite of anything that may occur in our international relations and irrespective of American claims. * * * We are only carrying out the provisions of the resolution that Congress passed and the treaty concluded between our country and the German Republic, a treaty justified by the Constitution and the decisions of the Supreme Court of the Republic of Germany, as I showed yesterday." (Page 4408, part 5.)

The House then returned to the former proposed amendment. It failed. A motion to recommit the bill was lost, and the bill as introduced was passed.

On March 3, 1923, the bill (H. R. 14222) appeared in the Senate, where Mr. Cummins stated:

"Mr. President, I desire, in the briefest possible way, to state the general features of this bill. The Alien Property Custodian has in his hands at this time property of the estimated

the Senate and the House came to an agreement, each mutually receding to a certain degree from the position taken (page 5576, part 6) and the bill became a law March 4, 1923. (Italics are mine.)

In further considering this question of the intention of Congress in passing these various remedial statutes, we should not overlook the inference fairly arising from the two subsections already referred to, (d) and (g). The latter (g) was added by the amendment of March 4, 1923. 42 Stat. 1511, c. 285, § 1 (U. S. Comp. Stats. Supp. 1925, § 3115½e). Both of these subsections— (d), comparatively old, and (g), the latest

value of $350,000,000. This bill, if enacted into law, will enable him to return, under the circumstances which I shall presently state, about $45,000,000 of either the property or the money now in his hands. In the administration of the laws the properties seized by the Alien Property Custodian during the war have been denominated as trust estates. The Alien Property Custodian at this time has 30,000 of those separate and independent estates, so called. This bill provides for the return of such of those estates as are under $10,000 in value. I am sure Senators will find it interesting when I say that the average of the estates under $10,000 is $750. The Alien Property Custodian is now taking care of and administrating as best he can at enormous expense 30,000 estates, 27,000 of which do not average more than $750. This bill, if it be enacted into law, will enable the Alien Property Custodian to return and close up 27,000 of those estates, and yet will take from the funds in his hands not more than $45,-000,000 or $50,000,000. The general purpose of the bill is to return to their former owners estates of $10,000 and lesser amounts, where, of course, the estates are not of that value, and that no matter what the citizenship of the claimant or owner may be.

"The bill has some other features, which will be undoubtedly noted as the debate proceeds; but I do not intend now to take the time to go over the bill in detail, because I think nearly everybody is somewhat familiar with the subject. The main purpose of the bill, however, is to give back to the poor people, the owners of limited amounts of property, what the Alien Property Custodian now has, and which it is costing either the owner or the government more to administer than the property is worth. It is proposed to give their property back and not to execute upon them the law of confiscation.

"So far as I am concerned, I make no hesitation whatever about it, if I were able, I would not confiscate any of this property. I do not believe it is in consonance either with morals or with the law to do so. This bill, however, is founded upon the theory that there will be sufficient remaining in the hands of the Alien Property Custodian, when all the property is turned back which can be turned back under the proposed law, to satisfy all the claims of American citizens who suffered injury at the hands of the German government." (Page 5275, part 6.)

legislation in regard to such conditions—relate to a claim to be made by a legal representative of a decedent.

Under subsection (d) we find a limited right; that is, that whenever the owner at time of seizure would have been entitled during his or her lifetime to reclaim the property, then such legal representative can make the claim for the estate, but under no circumstances can he distribute the estate remaining after payment of debts, etc., to any person who was not himself or herself qualified to claim such portion of the estate; under subsections (a), not an enemy or ally of enemy, (c), or (b) *an owner at the time of seizure* mentioned in (b), and its several classes of such owners. In 1923 Congress found that this limited right in cases of death would work the very hardship now argued here by counsel for plaintiff as an example of what might happen to heirs and next of kin, some of whom might be citizens of the United States.

If, therefore, the introductory clause of subsection (b) had not been considered an important part of subsection (b) and qualifying its subsections, there would seem to have been no point in this further legislation of 1923. Congress, however, made its intention clear by asserting the necessity therefor by passing subsection (g), whereby it expressly provided a means to avoid in certain cases the limitation which otherwise existed in subsection (d) by reason of the introductory clause of subsection (b), and exempted from the necessity of ownership at time of seizure the heir at law or next of kin who was a citizen of the United States. It made no such provision for an heir at law or next of kin who was a German citizen, or even one who sought to become a citizen of the United States after November, 1918.

This subsection (g) reads very differently from subsection (d), and allows a legal representative of *a decedent whose property has been seized* to proceed to recover the property and distribute it where a citizen of the United States has by reason of the death of a decedent inherited it. Even in this subsection (g) Congress placed limitations already mentioned that the heir at law or next of kin must be either a native-born citizen of this country or one duly naturalized, with a declaration of intention filed prior to November 11, 1918. It also imposed the same requirement that the legal representative would not distribute the property to any other distributee.

This intention is further shown by this subsection (g), that only where the legal representative was not entitled to proceed under subsection (d) should the legal representative proceed under subsections (a) and (g). In other words, it indicates that if a distributee, though a German citizen, was the owner of the property seized and within one of the owner classes of subsection (b), such claim would be made under subsection (d). If the distributee was a citizen of the United States (as qualified), *but not the owner at the time of seizure,* and for this reason the legal representative *could not proceed under subsection (d),* then such legal representative could proceed under subsection (a), which section does not contain the limitation of subsection (b), and obtain the estate and distribute it accordingly.

[5] In the case before me, as I have repeatedly said, the sole distributee here was not the owner of the property at the time it was seized and is a German citizen. The suit is based on subsection (d). The privilege thus given to a next of kin, who is a citizen of the United States, has not been given to one who is a citizen of Germany. Whether it should be is not a question for the court, but for Congress.

[6] The ability of Congress to express its intention, as shown in the different wording of these two subsections (d) and (g), should be given due weight. The intention of Congress as to the importance of ownership at the time of seizure, especially in cases of German citizens, is, I believe, shown by its legislation, and from the various remedial acts passed by it, all of which seems to have been most cautiously considered.

Aside from this consideration of the statutes and the debates in Congress, and considering the purpose of the sequestered fund and the source from which it was made up, it can be reasoned, I think fairly and sensibly, that if any one should get their property back from this fund before others, it should be those *whose property had been taken* and who have been deprived of its use. The intention of Congress has been to gradually recognize this necessity, and it may even be said to be unfair, to those citizens of Germany who are now alive, whose property has been taken, to return from this fund property to other German citizens, whose property has not been so taken, but who have simply inherited it, leaving the fund to consist of property of original owners who are still alive, and who in many cases possibly are greatly in need of same. At least this argument would not seem to be opposed to the intention of Congress as expressed in its legislation.

Counsel for plaintiff further contends that the United States had waived any further right to this sequestered fund, but I am compelled to find to the contrary, for in 1923 we find that the then Secretary of State, Mr. Hughes, wrote: "The resolution of July 2, 1921, provided, among other things, that sequestered property should be retained by the United States government until such time as the enemy governments made suitable provisions for the settlement of claims growing out of the war." The Secretary then goes on to state that any assumption that the claims of American citizens had been suitably settled, etc., was incorrect. Congressional Record, 67th Congress, 4th Session, part 4, p. 4309.

Possibly by now all or most claims have been adjusted. If so, the purpose of this sequestration has been fulfilled. If not, it may be that the claims have been materially reduced. This, however, is for Congress, and undoubtedly there will soon be no longer any desire or necessity for retaining the sequestered fund. Nevertheless it would seem to me reasonable to first return from the fund the property of living owners, from whom it was taken, before considering those who base their right on inheritance subsequent to the seizure.

The legislation of Congress therefore expresses a coherent, definite, and intentional plan. The various statutes have been enacted cautiously, and with express limitation at all times, considering the importance of ownership at the time of seizure. There has been no waiver of any rights to the fund by this government. On the contrary, it is a sequestered fund held for definite purpose by this government, in contemplation of matters to be adjusted in times of *peace* rather than in times of war, and with the full consent of both Germany and this country.

Counsel for plaintiff's side has devoted a considerable and forceful argument for what is really proposed legislation by the court. It should be borne in mind that, while from time to time there has been this indirect legislation by courts, "that does not mean that in judging the validity of statutes they [the courts] are free to substitute their own ideas of reason and justice for those of the men and women whom they serve. Their standard must be an objective one." Cardozo, "The Nature of the Judicial Process," p. 89, citing Otis v. Parker, 187 U. S. 608, 23 S. Ct. 168, 47 L. Ed. 323.

[7] This brings us to the decision. This distributee was and still is a German citizen. She was not the owner of the property at the time it was seized. I do not see how, under the statute, she can be said to be an eligible claimant under subsections (a), (b), and (c). The administrator would have no right to deliver to her the property which she now seeks. She cannot qualify under subsection (g).

It seems to me clear that the ownership at the time of seizure is still considered important by Congress so far as a German citizen is concerned. It would have been comparatively easy for Congress to have legislated otherwise if they had deemed it desirable. One must not overlook the nature of the fund and the present purpose of its sequestration, in considering any proposed diminishing of that fund.

Undoubtedly in due time Congress will consider broadening still further the rights of an executor or an administrator and extending the reclaiming rights to those not now mentioned by it, persons who are not infants, or of a certain sex, or who acquired the property from a certain source, or were not owners at time of seizure, although German citizens, and other limitations now present. Such legislation must be left to Congress. That body has access to much important governmental information not possible to be brought before a court. The conditions to be imposed for the return of their trust fund would seem to be for the government to express, and not for those who, though they never owned the property when sequestered, now claim that, because of inheritance, they should receive it.

I am willing to agree that this case is one of hardship. We have in substance an American permanently residing in Germany at a time when war was declared between Germany and this country. Her property is seized. The legality of such seizure is not before me, and I must assume that it was proper. The property seized, therefore, was enemy property, and duly became a part of the sequestered fund. No attempt, by this American owner, to reclaim the property was made.

[8] A German citizen, residing in Germany, now seeks to reclaim the property by reason of inheritance. That she now owns the property, subject to being defeated by conditions of the trust, may be admitted. I fail to see, however, any difference between this German citizen claimant and any other German citizen claimant. Her sole remedy is by statute.

We are not concerned with how ownership was acquired. We are only concerned with the facts as they are now presented. These facts show a German claimant to

property, in the fund, which she did not own at the time of seizure. Whether we agree with the purpose of the legislation or not, it would be necessary, in the case of this German citizen, to hold, in direct contradiction to the facts, that she was the owner of the property when seized, or, in direct contradiction to the words of the statute, to interpret the express condition of ownership of the property at the time of seizure to be meaningless, in order to allow a recovery in this case.

To the argument that might be made, that this in substance means that the property of an American has become a part of the sequestered fund, and is thus being held as security for claims of American citizens, it should be said that it was not property of an American citizen that was so seized and is so held, but *enemy property*, which seizure, as I have said, I must assume was legal and proper. The property, therefore, differs in no respect from any other property in the fund. A claimant thereto must come within the expressed words of the statute.

Some German citizens can get their property back at the present time; some cannot. It depends upon ownership of the property at the time of seizure. If this daughter had owned the property when it was seized, she could get it back. If she did not own it at that time, she cannot reclaim it. If she was an American citizen, or had commenced naturalization proceedings, prior to 1918, she could claim it, whether she owned it at the time of seizure or not.

[9] The only question remaining is that raised by defendant, that the former decree was res adjudicata. There does not seem to me to be much to this contention. The decree and the statements of the court in its decision plainly indicated otherwise. In the former case the plaintiff, although suing as administrator of a decedent's estate, sought to recover property which he failed to show belonged to the estate. His sole representative capacity rested in being an alleged assignee to an *alleged* donee of his intestate. Aside from the failure of proof above indicated, such a suit, governed and controlled by statute as it is, could not lie. The present suit is entirely different. It is one expressly based upon and authorized by the statute subsection (d). The denial of the motion to reopen simply indicated that the present suit was the one to be brought. There could be no attempt at that time to adjudicate in advance that, if such a suit was brought, there could be no recovery.

19 F.(2d)—64

The complaint must be dismissed without prejudice to such application for the property and proceedings therefor as subsequent legislation by Congress may render proper.