**JAMES S. LEE & CO., INC. (USA), Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 244–77.

United States Claims Court.

Jan. 3, 1986.

James J. Gallagher, for plaintiff. Michael D. Morin and McKenna, Conner & Cuneo, Washington, D.C., of counsel.

Richard W. Oehler, with whom was Acting Asst. Atty. Gen. Richard K. Willard, for defendant. William F. Bronson, Deputy Gen. Counsel, Army and Air Force Exchange Service, Washington, D.C., of counsel.

## OPINION

WIESE, Judge.

In an earlier decision entered in this case, this court determined that defendant, acting through the Vietnam Regional Exchange, a division of the Army and Air Force Exchange Service, had breached its custom tailoring concession contract with plaintiff. Specifically, the decision held that defendant's failure to terminate competing concessionaire operations at those military post exchanges where the volume of retail sales activity had fallen below the contract-specified support level was a breach of the contract's "Deletion Clause". This liability determination was affirmed on appeal and the case was remanded for a determination of the amount of damages "with the additional instruction that attention be given to the effect a notice period would have on the measure of damages." *James S. Lee & Co., Inc. (U.S.A.) v. United States*, 703 F.2d 584 (1982) (per curiam; unpublished).

The present opinion addresses the measure of damages owing to plaintiff as a result of defendant's breach. The facts are those stated in the decision on liability; such additional findings as are necessary to a resolution of the issue occur as part of the discussion or appear in the appendix that is included as part of the opinion.

### Background

As background to the issues that arise here, we begin by quoting from the prior decision on liability:

[T]he record shows that, of the various outlets to which more than one tailoring outlet had initially been assigned, six

"three-contractor" outlets (out of a total of 17) experienced a permanent downturn in retail sales below the initially-premised $500,000 support level. The record also shows—but offers no explanation why—the Group C contractor was not deleted after it became apparent that the sales depression would be permanent. (We assume such a judgment could have been made, say, at the end of three consecutive months of diminished retail activity.) [*James S. Lee & Co., Inc. (U.S.A.) v. United States*, No. 244–77, slip op. at 29–30 (Ct.Cl. Feb. 16, 1982) (unpublished) (footnote omitted).]

The opinion goes on to note that the failure to delete the Group C contractor was a breach of the contract's so-called "Deletion Clause". As to the damages resulting from this breach, the court noted that the contractor (meaning plaintiff) was entitled to recover such profits as it might reasonably have expected to receive from its share of the tailoring sales that were wrongfully diverted because of the Exchange's failure to delete the Group C contractor. To assist in this calculation, the opinion offered the following guidelines:

(i) the diverted or "lost" sales shall be the actual sales registered by the Group C contractor subsequent to three consecutive months of post exchange retail sales of less than $500,000; (ii) the contractor's share of these diverted sales shall be determined on a month-by-month basis in accordance with the ratio existing between its own actual monthly sales and the actual monthly sales of the competing Group B contractor. Finally, for the sake of reference, we add in a footnote the outlets that appear from the record to define the scope of the recovery. [*Id.* at 31; footnote omitted.]

Notwithstanding this seemingly straightforward formula for the determination of damages, the parties have been unable to resolve the matter on their own. Virtually every step necessary to the calculation of the amount of plaintiff's lost sales volume and the compensation due in consequence thereof is an issue in dispute.

Thus, the parties differ with regard to: (i) the triggering point for the operation of the Deletion Clause: when in point of time, should the Group C contractor have been deleted as a competing outlet—at the end of three months of diminished retail sales activity or some lesser (or greater) period?; (ii) the identification of those military post exchanges at which the Group C contractor should have been deleted in response to a fallback in post exchange retail sales volume to a level below $500,000 per month; (iii) the determination of the amount of tailoring sales wrongfully diverted to the Group C contractor because of the failure to terminate (*i.e.*, delete); (iv) the calculation of plaintiff's share of those sales; and, (v) the amount due plaintiff as compensation for unabsorbed overhead, under-absorbed material costs and profit on the reconstructed lost sales volume.

Of these various problems, only the last warrants discussion. The rest are matters for which the record offers no definite answers—they are, in truth, simply judgmental matters which the parties in a reasonable spirit of compromise and a more responsible concern for the use of judicial time could well have solved on their own. The discussion of these issues, being of no importance outside of this case, we leave to the appendix. All that needs to be said at this point is that from the discussion and information recited in the appendix, the court has concluded that plaintiff's share of the lost tailoring sales comes to $89,553. With that as the intermediate point of analysis, the question then becomes what measure of damages is Lee due on account of this lost sales volume?

*Discussion*

■ In awarding damages for breach of contract, the guiding rationale is to place the injured party in as good a position as he would have been in had the contract been performed. *Miller v. Robertson*, 266 U.S. 243, 247, 45 S.Ct. 73, 74, 69 L.Ed. 265 (1924). An award that is guided by this rationale, that is, where the aim is to secure to a party the benefit of the bargain,

is more typically referred to as the protection of a promisee's "expectation interest". *Restatement (Second) of Contracts* § 344(a) (1981).

■ Traditionally, the standard measure of damages for such cases has been the difference between the contract price and the market value of the repudiated goods. *United States v. Burton Coal Co.*, 273 U.S. 337, 340, 47 S.Ct. 351, 352, 71 L.Ed. 670 (1927). However, in cases such as this where the concept of a resale market does not fit, the alternative measure of damages "is the profit (including reasonable overhead) which the seller would have made from full performance by the buyer * * *." U.C.C. § 2–708(2) (1976). This compensation formula does not assure to a party the profits that he hoped to make when the contract was awarded; rather, its aim is to duplicate the actual values that would have been realized by the injured party had his performance been permitted to go forward. In other words, "[r]ecovery can be had only for loss that would not have occurred but for the breach." *Restatement (Second) of Contracts* § 347 comment e (1981).

It is with this last thought in mind that we turn to the specifics of this case. In the preparation of its bid, Lee assumed, despite words of caution to the contrary in the bid documents, that the outlet-by-outlet estimates of tailoring sales listed in the solicitation would prove to be substantially accurate over the contract term; hence it took these figures to be essentially synonymous with the actual sales that it might expect to generate in the course of performance. Based on that view of the situation, Lee structured a bid in which it allowed 7.3 percent as a return for fixed resources (*i.e.*,

overhead) and 5.1 percent as the expected rate of profit.

As things turned out, total monthly tailoring sales fell far short of the contract estimates—a result which the court's earlier opinion found to be directly traceable to a cutback of United States military forces in Vietnam.[1] In consequence of this much reduced sales volume, plaintiff's overhead, when expressed as a percentage of sales, increased dramatically—it rose from the 7.3 percent figure that had initially been assumed to more than 25 percent.

The result of this more than three-fold increase in relative overhead expense was that it neutralized plaintiff's expected profit of 5.1 percent and, in reality, brought plaintiff into a loss position. Stated otherwise, the sales volume was simply insufficient to generate the total revenue necessary to permit the recovery of plaintiff's fixed overhead expenses and anticipated profit. Restoration to plaintiff of the sales volume lost on account of defendant's breach would do little to change these results: overhead as a percentage of sales, though slightly reduced, would still remain far above the level at which profitability would emerge.[2]

Although plaintiff does not take issue with these points, it argues that it is entitled to a profit on the lost volume as well as the recovery of overhead. Indeed, it goes so far as to say that it should be allowed profit at an increased rate (15 percent is what it seeks), and return on overhead measured at its later actual rate, *i.e.*, 25.5 percent.

■ There is no basis upon which these percentage amounts may be allowed. Departures from the rates for overhead and

---

1. In the decision on liability the court rejected plaintiff's contention that the estimates appearing in the solicitation overstated the survey data from which they had been drawn or failed to take account of anticipated troop withdrawals. The court held, in substance, that the estimates were based upon the best information available and that the impact of troop withdrawals was a factor which plaintiff was alerted to and should have taken into account.

2. Lee's allowance of 7.3 percent for overhead was based upon an estimated sales revenue, after allowance for profit, of $7.6 million. However, the actual sales volume only came to $2.2 million, less than 28 percent of the estimated volume. Overhead, as a percentage of sales, correspondingly increased from 7.3 percent to 25.5 percent. An increase in actual sales by the indicated amount of $89,553 (the lost sales amount), would, therefore, result in an overhead percentage of 24.5 percent.

profit upon which a contract was originally let may make sense in situations where new work is being priced, as, for example, in determining the amount of equitable adjustment due a contractor on account of Government-added changes. In such circumstances, there is no reason to insist that the old pricing apply to the new work. Here, however, the focus is not upon the pricing of a contract enlargement; it is, rather, upon the pricing of work that was contemplated from the outset and which would have been performed at the original pricing but for the breach. Under those conditions, plaintiff cannot recover beyond the limits of the bargain that it struck. Since its bid assumed a fixed rate of return of 12.4 percent (divided, as noted, between 7.3 percent for overhead and 5.1 percent for profit), it is this bid rate which plaintiff is now entitled to receive. From the application of this figure to plaintiff's share of the lost sales volume ($89,553) we derive the sum of $11,105.[3] Since plaintiff was in a loss position at the time the breach occurred, the $11,105 becomes, in reality, no more than an offset or contribution to plaintiff's overhead burden.

In addition to the foregoing figure, the court has also determined (in calculations set out in the appendix) that plaintiff is due $23,776 for that portion of its unsalvageable yard goods inventory allocable to the lost sales volume. The sum of the amounts owing to plaintiff is, therefore, $34,881.

## CONCLUSION

Plaintiff is entitled to a judgment in the amount of $34,881. Costs shall not be awarded.

### *Appendix*

As was noted in the opinion proper, there are a number of factual issues bearing on the quantum determination that the parties have been unable to resolve. These issues are discussed in this appendix.

1. *The Measuring Period for Determining Deletion of the Group C Contractor:* In the opinion on liability, this court stated that the Group C contractor should have been deleted after three consecutive months of post exchange retail sales below the contract support level of $500,000. Plaintiff seeks a modification of this measuring period claiming that three consecutive months of diminished retail activity imposes a needlessly long "confirmation" period given the virtual certainty of ever-declining retail sales activity due to the announced phaseout of United States military forces from Vietnam. Thus plaintiff argues that a Group C contractor's termination should have been required after one month of post exchange retail sales volume below $500,000. To this sales information, which became available by the middle of the following month, plaintiff would then add a 30-day notice period. All-in-all, plaintiff would require removal of a disqualified Group C contractor within 75 days after the first day of the first month during which post exchange retail sales dropped below the contract's minimum support level (30 + 15 + 30).

Though there is merit to plaintiff's contention, nevertheless, the argument must go largely unheeded given that the three month formula stated in the opinion on liability was challenged, and affirmed, on appeal. Indeed, if any modification to the measuring period were permissible at this juncture, it could only be to enlarge that period. This is so because in the remand for determination of damages, the appellate court instructed "that attention be given to the effect a notice period would have on the measure of damages."

In accordance with the instruction given, this court has concluded that a 15-day notice period to provide for an orderly cessation of operations would be appropriate. However, no new sales could be written during this period. Therefore, the way it

---

**3.** This figure represents plaintiff's lost sales revenue minus the costs that were saved in not having to generate that revenue, *i.e.,* material costs, labor, and the Exchange Concession fee. The award embodies the goal in the lost-volume context of restoring the volume that would have been realized through performance.

works out is as follows: first, the permanency of the downturn in retail sales shall require confirmation through three consecutive fiscal months of post exchange retail sales below $500,000 (fiscal months ran from mid-month to mid-month); second, since sales for a given fiscal month were not reported until 15 days later (*i.e.*, at the fiscal month's calendar date ending) a notice of termination could not, as a practical matter, be given prior to that time. This, then, necessarily extends the Group C contractor's presence by an additional 15 days beyond the third fiscal month's close-out date. Accordingly, the measure of "lost sales", *i.e.*, those tailoring sales impermissibly realized by the Group C contractor because of the Government's failure to delete, are the sales recorded after the 90-day verification period and the 15-day reporting period we have identified. These sales are to be allocated between plaintiff and the remaining competitor, the Group B contractor—a matter we come to later.

2. *Identification of Outlets Requiring Deletion of the Group C Contractor:* Having determined the length of the period of diminished retail activity following which deletion of a Group C contractor would be contractually required, the next step is to identify those post exchanges that meet the stated conditions.

The parties agree that the Group C contractor should have been deleted at the following five outlets:

| Outlet No. 1023 | - | Qui Nhon |
| 1036 | - | II Field Forces |
| 1047 | - | Camp McDermott |
| 1049 | - | CRB AFB |
| 1067 | - | Bien Hoa AFB |

Plaintiff, however, would go further and argue that deletion should also have taken place at outlet No. 1042—Tuy Hoa AFB, and outlet No. 1051—90th Repl.Bn.

Outlet No. 1042—Tuy Hoa AFB, was included, along with the five uncontested outlets above, in the preliminary listing of outlets requiring deletion set forth in the court's opinion on liability. That list, however, was promulgated with the stated proviso that it might have to be modified in light of the parties' evidence adduced on the issue of damages. Such is the case.

The evidence going to the issue of quantum[1] establishes that although a Group C contractor might have been authorized to operate at outlet No. 1042, no Group C contractor ever in fact operated there. A review of the contemporary sales records before the court does not show any sales activity by the Group C contractor at outlet No. 1042. In the absence of such documentary evidence the court cannot, as plaintiff would have it do, assume that the Group C contractor operated at outlet No. 1042.

The second contested outlet, No. 1051—90th Repl.Bn., was an abandoned sales outlet. Plaintiff argues that the contract's deletion clause did not differentiate between abandoned sales and "new" sales outlets and, therefore, that the former

1. Plaintiff objects to the admissibility, *inter alia,* of the sales documents upon which the court relies in deciding this issue, *i.e.*, the Schedule of Custom Tailor Sales and the Schedule of Concession/Agency Transactions set forth in Defendant's Appendix. Plaintiff contends that the court's review in this action is limited to those documents contained in the administrative record (of which these documents are not a part). This argument must be rejected.

The claim in issue was one of a number of contract disputes originally tried before the Armed Services Board of Contract Appeals. Following a lengthy hearing before that body, the Board issued a decision rejecting certain claims for lack of merit while dismissing the contractor's "Estimates" claim and "Deletion Clause" claim for lack of jurisdiction. The case was then brought before the Court of Claims (this court's statutory predecessor) and proceedings here went forward subject to a Trial Judge's "Order On Briefing Procedure And Schedule". On the point now in issue, the order recites:

B. The parties' agreement to permit the breach claims [the "Estimates" claim and the "Deletion Clause" claim] to be decided on the basis of the administratively developed evidence extends only to the liability aspects of the two claims. The Government has specifically reserved its right to present *de novo* evidence on quantum should the determination of liability on the two breach claims go in plaintiff's favor. [Sep. 22, 1980 at 2.]

Plaintiff's attempt to exclude new evidence bearing on the issue of quantum must therefore fail.

were equally as susceptible to deletion as the latter.

However, the evidence leads to the conclusion that abandoned sales outlets were, in fact, treated differently. Crucial in this regard is the fact that the Group C contractor was added at outlet No. 1051 in August, 1971, at a time when monthly retail sales at that outlet fell well below $500,000. Were abandoned sales treated the same as new sales, the contract's formula for placing a third contractor at an outlet only when retail sales were above $500,000 would have precluded placement of the Group C contractor at No. 1051. The fact that the contract criteria were not applied in this instance is probative of the fact that abandoned sales were treated differently from new sales and that the contract's Deletion Clause did not apply to such outlets.

3. *Determination of the "Lost Sales" Volume.* As previously noted, the opinion on liability set forth two basic steps for determining the amount of sales that were to be restored to plaintiff:

(i) the diverted or "lost" sales shall be the actual sales registered by the Group C contractor subsequent to three consecutive months of post exchange retail sales of less than $500,000; (ii) the contractor's share of these diverted sales shall be determined on a month-by-month basis in accordance with the ratio existing between its own actual monthly sales and the actual monthly sales of the competing Group B contractor.

In addition to the problems thus far discussed, a further difficulty encountered in the application of the above-quoted formula is that complete sales figures are not available for each of the three contractors. Plaintiff's response to this situation is to substitute the estimated sales as given in the contract solicitation for the missing actual sales data. Defendant, on the other hand, would reconstruct the missing figures from those figures which are available.

Plaintiff's argument that "sales estimates provide a more constant and reliable measure of lost sales volume" is only partially correct. Certainly the sales estimates are "more constant" in that they do not vary from month-to-month, but it is precisely because of this unflagging symmetry, unblemished by the realities of actual experience, that the contract sales estimates are manifestly less reliable than sales figures reconstructed from the actual month-to-month experience of the contractors. Therefore, the proposed use of contract estimates where actual sales figures are unavailable has been rejected; instead, the court has reconstructed sales figures from the available data. This information, and the methodology by which it was obtained, is set out in the accompanying sales data tables A–1 through A–5.

In addition to the sales data tables, Lee's percentage share of C contractor sales is shown separately in Table B while, in Table C, the percentages are translated into specific dollar amounts. As noted there, Lee's share of the tailoring sales of which it was wrongfully deprived because of the Exchange's failure to delete the Group C contractor amounts to $89,553.

Finally, as a wholly separate matter, there is included a Table D which sets forth the calculations by which the court has determined the amount of the contractor's loss on the sale of its yard goods inventory that is allocable to the lost sales. That figure, as we note in the opinion, comes to $23,776.

**TABLE A-1**

Tailoring Sales Data (Actual and Reconstructed)

For Outlet No. 1023—Qui Nhon

| Fiscal Month | PX Retail Sales[1] | Lee[2] | Tailoring Sales B | C |
|---|---|---|---|---|
| March 1971 | $614,514 | $ | $ | $ |
| April | 617,686 | | [5] | [7] |
| May | 407,368 | 6,862 | 14,959 | 5,215 |
| June | 320,704 | 4,253[3] | 9,272 | 3,232 |
| July | 203,647 | 2,252 | 4,909 | 1,712 |
| August | 200,045 | 1,924 | 4,194 | 1,462 |
| September | 136,910 | 1,583 | 3,451 | 1,203 |
| October | 147,328 | 1,191 | 2,596 | 905 |
| | | | [6] | [6] |
| November | 132,958 | 2,694[4] | 2,800 | 1,440 |
| December | 168,072 | 1,858 | 5,055 | 1,119 |
| January 1972 | 129,828 | 909 | 3,107 | 1,029 |
| February | 139,895 | 1,486 | 3,794 | 802 |
| March | 138,654 | 844 | 1,881 | 824 |
| April | 177,407 | 691 | 1,871 | 1,194 |
| | | | [5] | [7] |
| May | 109,871 | 37 | 81 | 28 |

1. Government Exhibit 1.

2. ASBCA Memorandum Stipulation, Appendix D.

3. The "PX Payment Distribution List" for June 1971 shows sales to be $4,252.95, not $4,557 as shown in Exhibit A to Defendant's Brief.

4. ASBCA Memorandum Stipulation, Appendix D does not contain a document labeled as the November 1971 sales figures. However, the record does include an unmarked document whose figures correspond with those offered by defendant for November 1971 with regard to 3 of the 5 outlets in question. The court will therefore assume that this document represents the source of defendant's November 1971 sales figures. This being the case, defendant's Exhibit A incorrectly states Lee's sales as $1,525; the correct figure is $2,694.

5. Actual sales data not available. The reconstructed "B" sales figures listed below the footnote were obtained by applying the percentage of B sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (218%), to the Lee sales for the months in question.

6. Actual sales as shown on Government Exhibit 41.

7. Actual sales data not available. The reconstructed "C" sales figures listed below the footnote were obtained by applying the percentage of C sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (76%), to the Lee sales for the months in question.

**TABLE A–2**

Tailoring Sales Data (Actual and Reconstructed)

For Outlet No. 1036—II Field Forces

| Fiscal Month | PX Retail Sales [1] | Lee [2] | Tailoring Sales B | C |
|---|---|---|---|---|
| March 1971 | $668,539 | $ | $ | $ |
| April | 731,262 | | [4] | [6] |
| May | 475,433 | 6,976 | 14,580 | 10,534 |
| June | 456,775 | 4,504 | 9,413 | 6,801 |
| July | 461,275 | 9,537 | 19,932 | 14,401 |
| August | 520,627 | 8,599 | 17,972 | 12,984 |
| September | 511,408 | 5,125 | 10,711 | 7,739 |
| October | 337,163 | 3,488 | 7,290 | 5,267 |
| | | | [5] | [5] |
| November | 409,784 | 3,242 | 7,025 | 5,192 |
| December | 428,431 | 3,490 | 9,448 | 6,009 |
| January 1972 | 434,720 | 4,409 | 7,625 | 4,643 |
| February | 452,702 | 4,463 | 10,596 | 5,738 |
| March | 288,574 | 2,792 [3] | 5,012 | 6,344 |
| April | 82,364 | 1,854 | 2,758 | 2,747 |
| | | | [4] | [6] |
| May | 58,195 | 456 | 953 | 689 |

1.  Government Exhibit 1.
2.  ASBCA Memorandum Stipulation, Appendix D.
3.  The "Monthly Concessionaire/Contractor Statement of Account" for March 1972 shows sales to be $2,791.65, not $2,902 as shown in Exhibit A to Defendant's Brief.
4.  Actual sales data not available. The reconstructed "B" sales figures listed below the footnote were obtained by applying the percentage of B sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (209%), to the Lee sales for the months in question.
5.  Actual sales as shown on Government Exhibit 41.
6.  Actual sales data not available. The reconstructed "C" sales figures listed below the footnote were obtained by applying the percentage of C sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (151%), to the Lee sales for the months in question.

# TABLE A-3

Tailoring Sales Data (Actual and Reconstructed)

Outlet No. 1047 – Camp McDermott

| Fiscal Month | PX Retail Sales [1] | Lee [2] | Tailoring Sales B | C |
|---|---|---|---|---|
| March 1971 | $680,280 | $ | $ | $ |
| April | 785,185 | | [3] | [6] |
| May | 676,629 | 12,386 | 11,271 [4] | 7,060 [4] |
| June | 621,041 | 4,361 | 2,289 | 1,177 |
| July | 571,463 | 4,800 | 5,169 | 2,705 |
| August | 578,880 | 5,442 | 3,600 | 2,417 |
| September | 540,416 | 4,566 | 3,837 [3] | 2,543 [6] |
| October | 476,338 | 5,120 | 4,659 [5] | 2,918 [5] |
| November | 443,138 | 4,097 | 4,847 | 3,116 |
| December | 375,669 | 4,447 | 4,745 | 2,734 |
| January 1972 | 489,102 | 4,233 | 5,125 | 1,664 |
| February | 546,539 | 3,665 | 2,921 | 872 |
| March | 428,991 | 3,707 | 2,375 | 1,455 |
| April | 430,817 | 4,002 | 1,960 [3] | 4,031 [6] |
| May | 388,697 | 3,835 | 3,490 | 2,186 |

1. Goverment Exhibit 1.

2. ASBCA Memorandum Stipulation, Appendix D.

3. Actual sales data not available. The reconstructed "B" sales figures listed below the footnote were obtained by applying the percentage of B sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (91%), to the Lee sales for the months in question.

4. Actual sales as shown on "Schedule of Custom Tailor Sales", Exhibit D to Defendant's Brief. See Outlet No. 1049, n. 6.

5. Actual sales as shown on Government Exhibit 41.

6. Actual sales data not available. The reconstructed "C" sales figures listed below the footnote were obtained by applying the percentage of C sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (57%), to the Lee sales for the months in question.

## TABLE A–4

### Tailoring Sales Data (Actual and Reconstructed)

### For Outlet No. 1049 – CRB AFB

| Fiscal Month | PX Retail Sales [1] | Lee [2] | Tailoring Sales B | C |
|---|---|---|---|---|
| March 1971 | $630,440 | $ | $ | $ |
| April | 721,991 | | [5] | [7] |
| May | 599,577 | 17,536 | 24,901 [6] | 10,171 [6] |
| June | 629,162 | 6,437 | 5,761 | 2,572 |
| July | 602,399 | 11,542 | 15,929 | 7,171 |
| August | 616,759 | 8,266 | 14,128 | 5,306 |
| September | 517,919 | 9,346 | 14,575 [5] | 5,729 [7] |
| October | 424,185 | 11,948 | 16,966 | 6,930 |
| November | 441,997 | 14,084[3] | 19,999 | 8,169 |
| December | 436,847 | 18,590 | 26,398 | 10,782 |
| January 1972 | 487,255 | 13,957 | 19,819 | 8,095 |
| February | 626,089 | 9,485 | 13,469 | 5,501 |
| March | 342,768 | 6,538[4] | 9,284 | 3,792 |
| April | 210,723 | | | |
| May | 64,502 | | | |

1. Goverment Exhibit 1.

2. ASBCA Memorandum Stipulation, Appendix D. For fiscal months June – September 1971, defendant would utilize sales figures from Exhibit D to its Brief ("Schedule of Custom Tailor Sales") rather than figures from the ASBCA Memorandum Stipulation, Appendix D. The fact that these two sources present different sales figures for the same months demonstrates the difficulty of accurately determining damages in this case.

The court has determined, in the interest of consistency, to utilize only the ASBCA Memorandum Stipulation, Appendix D sales figures when presenting Lee's monthly sales.

3. ASBCA Memorandum Stipulation, Appendix D does not contain a document labeled as the November 1971 sales figures. However, the record does include an unmarked document whose figures correspond with those offered by defendant for November 1971 with regard to 3 of the 5 outlets in question. The court will therefore assume that this document represents the source of defendant's November 1971 sales figures. This being the case, defendant's Exhibit A incorrectly states Lee's sales as $13,159; the correct figure is $14,084.

4. The "Monthly Concessionaire/Contractor Statement of Account" for March 1972 shows sales to be $6,538.25, not $6,405 as shown in Exhibit A to Defendant's Brief.

5. Actual sales data not available. The reconstructed "B" sales figures listed below the footnote were obtained by applying the percentage of B sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period June – September 1971 (142%), to the Lee sales for the months in question.

6. Actual sales as shown on "Schedule of Custom Tailor Sales", Exhibit D to Defendant's Brief.

7. Actual sales data not available. The reconstructed "C" sales figure listed below the footnote were obtained by applying the percentage of C sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period June – September 1971 (58%), to the Lee sales for the months in question.

## TABLE A–5

### Tailoring Sales Data (Actual and Reconstructed)

#### For Outlet No. 1067 – Bien Hoa AFB

| Fiscal Month | PX Retail Sales [1] | Lee [2] | Tailoring Sales B | C |
|---|---|---|---|---|
| March 1971 | $576,489 | $ | $ | $ |
| April | 685,864 | | [3] | [6] |
| May | 515,797 | 13,711 | 15,356 | 20,567 |
| June | 463,626 | 5,172 | 5,793 | 7,758 |
| July | 430,776 | 16,075 | 18,004 | 24,113 |
| August | 447,230 | 11,791 | 13,206 | 17,687 |
| September | 429,866 | 10,658 | 11,937 | 15,987 |
| October | 329,252 | 10,515 | 11,777 [4] | 15,773 [4] |
| November | 346,743 | 7,594 | 13,981[5] | 12,805 |
| December | 356,537 | 9,501 | 12,451 | 13,373 |
| January 1972 | 278,836 | 9,196 | 11,113 | 10,132[7] |
| February | 382,688 | 13,565 | 13,853 | 18,730 |
| March | 311,649 | 13,556 | 10,798 | 21,246 |
| April | 258,271 | 10,564 | 9,156 [3] | 19,777 [6] |
| May | 229,853 | 4,838 | 5,419 | 7,257 |

1. Goverment Exhibit 1.

2. ASBCA Memorandum Stipulation, Appendix D.

3. Actual sales data not available. The reconstructed "B" sales figures listed below the footnote were obtained by applying the percentage of B sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (112%), to the Lee sales for the months in question.

4. Actual sales as shown on Government Exhibit 41.

5. Government Exhibit 41 shows $13,981.05, not $13,481 as shown in Exhibit A to Defendant's Brief.

6. Actual sales data not available. The reconstructed "C" sales figures listed below the footnote were obtained by applying the percentage of C sales to Lee sales, as reflected in actual sales recorded at this outlet during the reference period November 1971 – April 1972 (150%), to the Lee sales for the months in question.

7. Government Exhibit 41 shows $10,132.35, not $10,135 as shown in Exhibit A to Defendant's Brief.

## TABLE B

### Lee's Share of C Sales *

| Fiscal Month | 1023 Qui Nhon | 1036 II Field | 1047 McDermott | 1049 CRB AFB | 1067 Bien Hoa |
|---|---|---|---|---|---|
| May 1971 | | | | | |
| June | | | | | |
| July | | | | | |
| August | 31% | 32% | | | |
| September | 31 | 32 | | | 47 |
| October | 31 | 32 | | | 47 |
| November | 49 | 32 | | | 35 |
| December | 27 | 27 | | | 43 |
| January 1972 | 23 | 37 | 45 | 41 | 45 |
| February | 28 | 30 | 56 | 41 | 50 |
| March | 31 | 37 | 61 | 41 | 56 |
| April | 27 | 40 | 67 | | 54 |
| May | 31 | 32 | 52 | | 57 |

* Lee's percentage share of the sales that were wrongfully diverted because of the Exchange's failure to delete the Group C contractor subsequent to three months of post-exchange retail volume below $500,000 is represented by the formula: $\dfrac{\text{Lee sales}}{\text{Lee sales} + \text{B sales}}$

## TABLE C

### Lee's Lost Sales [1]

| Fiscal Month | 1023 Qui Nhon | 1036 II Field | 1047 McDermott | 1049 CRB AFB | 1067 Bien Hoa |
|---|---|---|---|---|---|
| May 1971 | | | | | |
| June | | | | | |
| July | | | | | |
| August | $ 227[2] | $ 2,078[2] | $ | $ | $ |
| September | 373 | 2,477 | | | 3,757[2] |
| October | 281 | 1,685 | | | 7,413 |
| November | 706 | 1,661 | | | 4,482 |
| December | 302 | 1,622 | | | 5,750 |
| January 1972 | 237 | 1,718 | 375[2] | 1,660[2] | 4,559 |
| February | 225 | 1,721 | 488 | 2,255 | 9,365 |
| March | 255 | 2,347 | 888 | 1,555 | 11,898 |
| April | 322 | 1,099 | 2,701 | | 10,680 |
| May | 5[3] | 111[3] | 569[3] | | 1,706[3] |
| Total | 2,933 | 16,519 | 5,021 | 5,470 | 59,610 |
| Total All Outlets: | $89,553 | | | | |

1. Arrived at by multiplying Table C sales (Tables A–1 through A–5) by Lee's percentage share of those sales (Table B).

2. One-half of Lee's proportionate share. After three fiscal months of sub-$500,000 PX retail sales, the contractor should have been deleted. Fiscal month sales figures were available the first day of the following calendar month. Notice should immediately have been given to the C contractor that no new sales were to be written. Thus, since the first of the calendar month fell in the middle of the fiscal month, ½ of the fiscal month sales belonged to C. Lee is entitled to the remaining ½.

3. One-half of Lee's proportionate share. The contract ended on calendar May 4, 1972. Since the fiscal month May 1972 ran from calendar April 20 to May 20, calendar May 4 would fall in the middle of fiscal May. Thus, Lee is entitled to ½ of fiscal May 1972 sales.

## TABLE D

### Calculation of Underabsorbed Material Costs Allocable to Lost Sales

1. Determining Percentage of Inventory Allocable to Post-Contract Period

   $ 418,884 – post-contract material purchases (May 1972–December 1972)
   $2,619,916 – total material costs, including:

         a.  raw material inventory
         b.  finished goods inventory
         c.  material purchases May 1, 1971–December 31, 1972

   = 16%

2. Determining Total Loss on Inventory Liquidation

     $ 461,843 – loss on sale of stocks
   +$ 245,785 – ending raw material inventory (assumed to be unsalvageable)
     $ 707,627 – total material loss (May 1, 1971–December 31, 1972)

3. Determining Percentage of Inventory Loss Allocable to Post-Contract Period

   $ 707,627
   ×    16%
   $ 113,220 – material losses attributable to post-contract material purchases

4. Determining Percentage of Inventory Loss Allocable to Contract Period

    $ 707,627
   −$ 113,220
    $ 594,407 – material losses attributable to contract material purchases

5. Determining Percentage of Lee's Lost Sales to Lee's Total Actual Sales

   $   89,553 – lost sales
   $2,155,244 – total Lee actual sales

   = 4%

6. Determining Amount of Loss on Inventory Liquidation Allocable to Lost Sales Volume

   $ 594,407 – material losses
   ×     4% – rate of underabsorption
   $   23,776 – MATERIAL LOSSES DUE TO LOST SALES